# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                          BKY 13-60824-MER

**Todd Allen Crabtree and**
**Terryl Lynn Crabtree,**                       Chapter 7

        **Debtors.**

**Daniel M. McDermott, United States Trustee,**     Adv. No. 14-6025

        **Plaintiff,**

    **v.**

**Todd Allen Crabtree and**
**Terryl Lynn Crabtree,**

        **Defendants.**

_____

## MEMORANDUM DECISION
_____

At Fergus Falls, Minnesota, August 8, 2016.

The matters pending before the Court involve an adversary proceeding brought by the

United States Trustee ("UST"), in the form of several objections to the Debtors' discharge under

11 U.S.C. § 727 ("727 trial"),[1] and a challenge by the chapter 7 trustee ("Trustee") to the

Debtors' claimed homestead exemption under 11 U.S.C. § 522(o) ("exemption trial").[2]

Although separate trials were held on the respective matters, because of the interconnectedness

of the proceedings, this decision will embrace both.[3]  Appearances were as noted on the record:

_____

[1]  See Complaint of the UST.  Ex. 4.

[2]  See The Trustee's motion objecting to claimed exempt property.  Ex. 9.

[3]  It should be noted that the trial of the 727 trial spanned the better part of seven days:
April 28-30, 2015; June 15-16, 2015; and June 23-24, 2015; several witnesses testified and

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 08/08/2016
Lori Vosejpka, Clerk, by AMM

Colin Kreuziger, Esq., for the UST; Gene Doeling, Esq., for the Trustee; and Robert Russell, III, Esq., for Mr. and Mrs. Crabtree ("the Debtors" or "the Crabtrees" or "Todd" and "Terryl").[4]  The Court requested and received extensive post-trial briefs; both matters are now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction under 28 U.S.C. §§ 157(a) and 1334.  The Court makes this memorandum decision based on all the files, records, and proceedings herein, and under Fed. R. Bankr. P. 7052, made applicable to the contested matter (the exemption issue) by Fed. R. Bankr. P. 9014(c).  For the reasons set forth below, the Debtors' discharge will be denied, and the Trustee's objection to the Debtors' homestead exemption will be sustained.

## BACKGROUND[5]

This is a story about a very closely-knit family, Todd Allen Crabtree, and his wife Terryl Lynn Crabtree.  They have three children: Bethany Harris a/k/a "Breezy," ("Bethany" or "Breezy") age 28; Gunnar Crabtree ("Gunnar"), age 30; and Bror Crabtree ("Bror"), age 25. Bethany is married to Mike Harris; Gunnar's wife is Lindsay Crabtree ("Lindsay"); Bror is single.  All have, at one time or another, been involved in the many businesses set up or run by

---

hundreds of voluminous exhibits were considered.  The exemption trial was held on June 25, 2015, and July 29, 2015.  Counsel for the Debtors and the Trustee stipulated that all exhibits received into evidence in the section 727 trial, together with the testimony, could be considered by the Court in the Trustee's challenge to the Debtors' claim of exemptions.  See Fed. R. Evid. 201.  Citations to the trial will be made by referring to the date of the hearing, followed by the page and line number, e.g., 4-28-15 transcript, p. 48, lines 15-18.

[4]  Both Todd and Terryl were personally present during each day of trial, on both matters.

[5]  The UST and the Debtors stipulated to certain undisputed facts.  ECF No. 32.  The Debtors and the Trustee did the same.  ECF No. 105.  To the extent not otherwise stated in this opinion, those stipulations are hereby incorporated herein by reference.

Todd.  All of these individuals testified at the two trials that are the subject of this memorandum decision.

Todd is a licensed attorney; he obtained his juris doctor from Hamline University.  He also holds an MBA from the University of Minnesota's Carlson School of Business.  And he is also a licensed chiropractor.  Todd operated Crabtree Law Firm, P.A. ("Crabtree Law Firm"), and its predecessor entities from 1990 until December 2013.  Crabtree Law Firm was primarily involved in plaintiff's personal injury cases taken on a contingency basis.  It then began to perform legal services, on an hourly basis, related to health care compliance, until it ceased operations in early December 2013.  About that same time, Todd formed Crabtree Health Law P.A. ("Crabtree Health Law"), to work in conjunction with another entity created by Todd, Clinic Doctor, Inc. ("Clinic Doctor").

Clinic Doctor is engaged in the business of providing online billing and electronic health records services to chiropractors nationwide.  It also provides advice and guidance on statutory and regulatory guidance to the chiropractic community.  It's Chief Executive Officer is Todd.  He owns a 35% interest in Clinic Doctor, and his wife, Terryl, holds a 31% interest in the company.[6]

Terryl holds a B.A. degree in education.  She testified that she provides administrative support and marketing assistance for Clinic Doctor.  Gunnar and his wife, Lindsay, together own something less than a 6% interest.  All of the Crabtrees' immediate family members, except Gunnar, either presently work as employees for Clinic Doctor, or have worked there.

---

[6]  The Stipulation of Facts states that Todd and Terryl "own a 71% interest . . . in Clinic Doctor, Inc."  ECF No. 32.  This discrepancy was not explained at the trial.  In any event, it is of no consequence in the determination of any factual or legal issue herein.

3

All told, Crabtree Law Firm, while it was in business, Crabtree Health Law, and Clinic

Doctor employed all of the family members as well as son-in-law Mike Harris, and daughter-in-

law Lindsay.  The daily operations of these businesses were quite interconnected.

*THE VEHICLES/THE JOHN DEERE TRACTOR*

Historically, the Crabtrees purchased vehicles for the use of themselves and their

children.  They typically titled the vehicles in the name of either Crabtree Law Firm, Clinic

Doctor, themselves, or some combination thereof.  They also paid for routine maintenance items.

The Crabtrees and their children used the vehicles for all purposes, both business and personal.

Crabtree Law Firm purchased a 2004 Toyota RAV4 ("the RAV4").  The vehicle was

titled in the names of the Crabtree Law Firm and Todd. Todd and Terryl used this vehicle for

both business and personal needs.  Lindsay and Gunnar also used the vehicle for personal

purposes, including commuting to and from work, while it was titled in the name of Crabtree

Law Firm.  The RAV4 was transferred to Gunnar on May 29, 2013.

Clinic Doctor also leased a Chevy Tahoe.  That company also made the lease payments.

The Chevy Tahoe was also used by Lindsay and Gunnar for personal purposes, including

commuting to and from work.  In addition, Terryl also used the vehicle for personal purposes.

Also, either Clinic Doctor or Crabtree Law Firm and Terryl or Todd owned a Toyota FJ

Cruiser.  Clinic Doctor made the payments on the FJ Cruiser.  The parties testified that Terryl,

Mike and Bethany, and Gunnar and Lindsay, all used this vehicle for personal purposes.

Crabtree Law Firm also owned a 2007 GMC Yukon.  The firm purchased the vehicle and

paid for routine maintenance.  Initially, the vehicle was driven by Todd and Terryl, and then later

by Mike and Bethany.  Todd and Terryl used the GMC Yukon primarily for personal purposes;

4

Mike and Bethany also used it primarily for personal purposes.  During this time frame, the

Harrises owned no vehicles of their own, and used only the FJ Cruiser and the GMC Yukon.

Crabtree Law Firm transferred title to the GMC Yukon to Mike Harris, in the summer of 2013;

he did not pay anything to the law firm.

At one time the Crabtrees purchased a 1999 Ford F-150 for their son, Bror, while he was

in high school.  Either Todd or Terryl was listed as owner on the certificate of title.  The vehicle

was involved in an accident and was totaled in May 2007; the insurance proceeds were paid out

and were used to purchase a 2003 Ford F-150.  The latter vehicle was jointly titled in the names

of Terryl and Todd.  Terryl transferred ownership of the truck to Bror; he did not pay her

anything for the ownership interest.

As a general matter, Crabtree Law Firm maintained time records for its staff, although it

did not keep any record of work that either Lindsay or Mike Harris may have performed for the

law firm.  Neither Crabtree Law Firm nor Clinic Doctor issued IRS Form W-2s or IRS Form

1099s to family members for their personal use of the corporate vehicles until after the UST

commenced his § 727 action or not at all.

The Crabtrees also used the corporate entities to make payments for other personal

expenses, including payments on a mortgage secured by their homestead, the purchase of

building supplies for their homestead, payments to contractors that worked on their homestead,

payments for gas for their vehicles, groceries, recreational expenses, and charitable contributions

to their church, Firestarters Worship Center ("Firestarters").  Initially, the Crabtrees did not

report any of the compensation when they filed their personal income tax returns; however, they

later filed amended returns for the years in question.[7]

Todd testified that "roughly fifteen years ago" he had purchased a John Deere 4400 tractor with attachments for $30,000.00.  On the statement of financial affairs, the tractor was listed as being in the Debtors' possession, but was owned by Gunnar.

Todd testified that he had given the tractor to Gunnar sometime in 2010, to plant a corn field.  Gunnar, however, testified that he only began farming in either 2013 or 2014.  The tractor was used extensively by the Crabtrees in their efforts at building the newer house on the property where the Crabtrees lived.  The evidence also showed that Bethany paid for several improvements to it in 2012, using funds from the farm account.  No documentation showing the transfer of ownership of the tractor to Gunnar was produced.

### *CRABTREE BROTHERS, LLC*

At the time the Debtors' filed bankruptcy, Todd claimed a 50% ownership interest in Crabtree Brothers, LLC ("Crabtree Brothers"), an entity that owned four parcels of real estate in Colorado.  The other owner of this entity was Todd's brother, Paul Crabtree.  According to Todd's testimony, each parcel was valued at approximately $30,000.00.  On Schedule B, however, Todd stated that Crabtree Brothers had no value, and that its "debts exceeded its assets."

The tax returns filed by Crabtree Brothers reflected Todd's ownership interest in this entity as 100% in 2009 to 75% for each of the years 2010 to 2013, inclusive.  Todd also testified that he transferred his ownership interest in the four lots to his brother, Paul, although he was

---

[7]  See Exs. RRRRR, SSSSS, VVVVV, YYYYY, and ZZZZZ.

unable to produce any documentary evidence of such transfer.[8]  He also stated that the entity was

defunct as of early 2013.  Todd also testified at the trial that one of the development contractors,

Kaess Contracting, Inc. ("Kaess"), sued Crabtree Brothers in January 2015, for unpaid work that

had been done on the lots.  In settlement of that lawsuit, Crabtree Brothers agreed to convey one

of the lots to Kaess.

### CIVIL ACTION GROUP, LTD. ("CAG")

Todd, while at the height of his personal injury practice with Crabtree Law Firm, had

entered into an arrangement with CAG, going back as far as 2001, wherein CAG would advance

certain expenses incurred by Todd in the prosecution of his clients' personal injury claims.  In

other words, CAG would advance or "front," funds for case costs and services, and then collect

when the proceeds were paid out of any settlement or collection.[9]  Todd had personally

guaranteed the indebtedness owed CAG by the law firm.  On February 19, 2010, CAG sued

Todd and Crabtree Law Firm in state court.  Ultimately, judgment in CAG's favor was entered

against Todd, individually, for $390,094.23, and against Crabtree Law Firm in the amount of

$391,253.48.  The judgments were docketed on September 28, 2010, in Hennepin County,

Minnesota, and, on November 2, 2010, were transcribed in Otter Tail County, Minnesota.[10]

In January 2011, Todd, with the assistance of a bankruptcy attorney, entered into a

settlement agreement with CAG; the agreement contemplated monthly payments of $3,860.09 to

---

[8]  When asked by the UST to do so, the only "evidence" Todd could point to was an
email exchange dated April 14, 2009, between the two brothers.  See Ex. P.

[9]  An arrangement often referred to as "factoring," which is "[t]he buying of accounts
receivable at a discount." *Factoring*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[10]  CAG has commenced an adversary proceeding, 14-6008, in which it alleges that
Todd's debt is non-dischargeable.  That lawsuit has been stayed pending resolution of this one.

CAG to retire a stipulated debt of $400,000.00, at 10% simple interest, over a period of 20 years. The agreement also required Todd to "make payments larger than the monthly amount due when Crabtree receives windfall settlements from Crabtree Law Firm cases or from property sold."

Todd made regular payments to CAG per the agreement until the middle of 2013. Todd was getting behind on his payments; his last payment to CAG was in July 2013. On December 5, 2013, fearful "that CAG was on the cusp of garnishing [his] accounts," Todd ceased operating as Crabtree Law Firm, and incorporated Crabtree Health Law, P.A ("Crabtree Health Law"). On December 9, 2013, CAG levied on accounts of Crabtree Law Firm. The account was actually a trust account, and not an operating account, containing $47,167.79, of which $20,268.03 belonged to clients of Crabtree Law Firm.[11]

Meanwhile, Crabtree Health Law collected the outstanding accounts receivable and finished up pending cases of Crabtree Law Firm. The Crabtrees continued to operate Crabtree Health Law for their own personal benefit. In January of 2014, Crabtree Health Law paid Terryl $5,000.00. The funds were receivables of Crabtree Law Firm. The Crabtrees also used Crabtree Law Firm funds to pay expenses of Crabtree Health Law. The funds were not used to pay creditors of Crabtree Law Firm.

### ESTATE OF RALPH BLOHM, JR.

Ralph Blohm, Jr. was Todd's stepfather. Mr. Blohm died on May 16, 2012. He left a will, in which he designated Todd as the executor of his estate. Todd was also a named beneficiary. On September 20, 2012, Todd filed an application for informal probate of Mr.

---

[11] According to Todd, he immediately contacted the Minnesota Board of Professional Responsibility and reported the levy, and provided an accounting in an effort at identifying the proper ownership of the clients' funds.

Blohm's will; the state court informally appointed Todd as the executor of the Blohm estate.

Todd opened an account in his name at Woodlands National Bank in May 2012.  This account

was not disclosed in the Debtors' bankruptcy schedules.  Ex. 3 at 13.  It was through this

personal account that Todd handled all of the financial affairs of the Blohm estate.

In 1999, prior to his death, Mr. Blohm and his wife (Todd's mother) transferred their

interest in a cabin, situated on a lakeshore near Zimmerman, Minnesota, to Todd and his five

siblings.  Mr. and Mrs. Blohm retained a life estate in the property, so at the time of Mr. Blohm's

death, in 2012, Todd owned, as did each of his five siblings, and undivided one-sixth interest in

the lakeshore property.[12]  Todd oversaw the sale of this property, which ultimately was sold, on

October 24, 2012, to Todd's sister, Dianne Johnson n/k/a Dianne Merrifield.  Each of the

siblings, including Todd, received proceeds of $49,333.85.  The next day, October 25, 2012,

Todd deposited his proceeds check into his Woodlands National Bank account.  That same day,

Todd wrote two checks on that account: one to his daughter, Bethany, for $30,000.00, which he

claimed was to be deposited into the farm account for improvements to the family farmstead, and

the second, in the amount of $19,333.85, to Terryl.  Neither Bethany nor Terryl was a

beneficiary of the estate of Ralph Blohm.

*RETIREMENT ASSETS & VALUABLE COINS*

According to the evidence, by October 2005, the Crabtrees had accumulated significant

personal assets, including:

- Securities valued at $1,635,620.00;
- Idex retirements funds valued at $24,845.00;
- US Allianz Retirements Funds valued at $59,533.00;

---

[12]  Mrs. Blohm passed away in 2002.

- $29.322.00 in cash from the liquidation of Templeton stock (April 20, 2009);
- $55,029.00 from an IRA distribution in 2010; and
- $63,800.00 in cash from the liquidation of Todd's shares of stock in North American Banking Co. & the Crabtrees' interest in a marina (August - September 2011).

None of the funds generated from the liquidation of the above assets appears to have been used to pay the CAG indebtedness.

The Crabtrees also purchased valuable coins as part of their investments, including:

- 500 2009 1- ounce Silver Eagle coins from Blanchard & Co., Inc. (November 9, 2009), for $9,965.00;
- 500 silver coins from Blanchard (December 18, 2009), for $10,100.00 (these same coins were sold back to Blanchard on November 19, 2010 for $13,760.00);
- 500 coins 2010 1- ounce Silver Maple Leaf coins, for $10,245.00 (January 9, 2010);
- 500 2010 Vancouver 1-ounce Silver Maple Leaf coins, for $9,770.00 (January 23, 2010); and
- An additional 500 1-ounce Silver American Eagle coins, for $9,620.00 (January 23, 2010).

Sometime in 2010, the Debtors transferred 500 silver coins to each of their sons, Bror and Gunnar, for no consideration. Other than "[writing] their name [sic] on the box," the Crabtrees did not document the transfer of the coins. On August 31, 2013, Todd transferred 250 silver coins to his son-in-law, Mike Harris, who cashed in the coins on September 7, 2013, for $6,375.00, of which $2,353.47 was used to pay outstanding invoices related to the construction of the Debtors' house. The remaining balance of $4,021.53 was deposited into the Harrises's personal savings account. At the time of this transfer, the Crabtrees did not owe Mike or Bethany any money. Todd also testified that in September 2013, he transferred a box of 500 silver coins, worth about $12,000.00, to the church that the Debtors regularly attended, Firestarters.

10

*FIRESTARTERS WORSHIP CENTER*

Todd and Terryl both unabashedly refer to themselves as "Jesus freaks" and "born-again Christians." In 2012, they started to regularly attend services at a church known as Firestarters, located in Ottertail, Minnesota. It is an organization recognized by the Internal Revenue Service as a § 501(c)(3) charitable institution. Its pastor is Peter Thiel, its ordained minister since 2003. His wife, Pamela, is also a minister. Mr. Thiel testified at the 727 trial; he also does work in construction and design through his business known as PT Design. On cross-examination, Mr. Thiel testified that his company received a "nominal fee" for the foundation work on 28000 415th Street, Vergas, Minnesota, the Debtors' homestead ("the homestead"), and that he was paid nothing for the roofing work. Yet, the record reflects that his company was paid $7,000.00 for work on improvements to the homestead.

In September 2013, the Crabtrees transferred a box of 500 silver coins to Firestarters; they placed a value of $12,000.00 on these coins. Mr. Thiel testified that the coins were not "earmarked for any special purpose" and that the church still had them in its possession. The Crabtrees received nothing in exchange for the coins.

In addition to the coins, in 2013, the Crabtrees tithed $4,570.00 to Firestarters, bringing their total contributions that year to $16,570.00. Todd testified that between 2009 and 2012, he never reported charitable donations of more than $10,000.00 on his federal tax returns.

Firestarters had received a donation of a structure known as the "Historic St. Paul House." The donor wanted the building removed from its original location, also in Ottertail, Minnesota, so the church hired Schmit Moving, Inc. to move it onto the property owned by the church. On November 16, 2013, Crabtree Law Firm paid the moving company $10,000.00 to

help defray the $18,000.00 or $19,000.00 total cost of the move.  Todd testified that he made this transfer, both as a gift to the church and with the hope that Crabtree Health Law could use a room in the building as an office.[13]

Crabtree Law Firm also contributed $3,649.00 to "Studio Consultants," a music business owned by Mr. Thiel's son, for the purchase of sound equipment for the use of the church.  This gift was made on October 22, 2013.  Todd testified that the money was paid in the hope that the group, referred to as the "church band," would prepare a jingle for his law firm, and for the band members to assist him in raising a barn at the Crabtree homestead.  Neither expectation was fulfilled.

## THE HOMESTEAD IN VERGAS, MINNESOTA

At the time they filed their bankruptcy petition, the Crabtrees were living on the homestead, an 80-acre parcel of land located in Vergas, Minnesota.  Todd had purchased this land in 1999; his family built a small cabin on the property in the early 2000's.  The structure had no plumbing or electricity.[14]  According to Todd, the cabin was built as a learning experience for his family.

Prior to moving to the Vergas property, the Crabtrees were renting a home on Lake Lida,[15] about three miles from the homestead.  Clinic Doctor paid the monthly rent of $1,500.00.  The Crabtrees rented the property for thirteen months.

---

[13]  At the time of trial, there had been no such office set up for either Todd or any of his entities.

[14]  When referring to this structure, Todd testified, "we never called it a house, because it barely even qualifies as a cabin."

[15]  The home was owned by Dale Pierce, whose son owned Pierce Log Homes.

Todd, Terryl, and Bror slept at the Lake Lida home.  Testimony revealed that one of Bror's friends also slept there for a short period of time.  The home had five bedrooms and a large office.  All of the residents worked out of the home and ate their meals there.  Mike and Bethany, together with their three children, also ate and showered at the Lake Lida home.

Prior to moving to the Lake Lida home, the Crabtrees lived in a house located in Scandia, Minnesota.  They defaulted on the mortgage in 2010; the bank foreclosed on the property in late 2011, and a sheriff's sale was held on November 16, 2011.  The statutory redemption period expired in May 2012.  According to Todd:  "We knew that we could no longer make payment on our Scandia house and then also make payment to the [CAG] and so we made the hard decision . . . but we thought that most likely we were going to end up here in Vergas."  6-25-15 transcript, p. 181, lines 17-20; p. 182, lines 14-15.

In March 2012, the Crabtrees began building a second structure on the homestead property.  They worked with Pierce Log Homes and other people to construct the new house.  During this construction, the Harrises and their three children lived in the cabin, also located on the Vergas property.  Bror and his friend moved out of the Lake Lida property in the spring of 2013.  Bror moved to Wisconsin.  About that same time, the Crabtrees moved back to Vergas.

At the time of trial, the Harris family and Todd and Terryl lived in the newer house, and Todd and Terryl slept in the cabin.  The newer house is about 2,700 square feet, and has three bedrooms and two bathrooms.  On their Schedule A, the Debtors valued the house at $200,000.00.  Their Schedule D reflected an outstanding mortgage balance on the property of $133,725.00, leaving equity of $66,275.00; they claimed this equity as exempt under MINN. STAT. § 510.02.

13

*THE "FARM ACCOUNT"/IMPROVEMENTS TO THE HOMESTEAD*

In March 2012, Bethany opened a checking account at Wells Fargo bank.  She testified that she was listed as an owner, as was her brother, Bror.  This account, ending in the numbers "5227," was commonly referred to by the Crabtree family as "the farm account." Bethany testified that "[i]t was an account for the community for building and for our animals and stuff." Later, in response to the Trustee's question, "I think you testified that the intent, or part of the intent in opening the accounts was to assist in paying for the improvements to the homestead property[,]" she responded, "Yes."  Todd corroborated this intent when he testified that "[a]s I recall, we had a family meeting on how we were going to handle the payment for the construction and building of the farm and house[,]" in response to the Trustee's question about opening the account.  The Crabtrees did not disclose an interest in this account on their bankruptcy schedules.  Ex. 3 at 13.

Bethany testified that she was to deposit $800.00 a month into the account, and that Bror was to deposit the sum of $400.00 per month, although he didn't contribute as regularly as Bethany did.  Todd and Terryl also made deposits, but there was no set sum for any deposit from them.  In point of fact, the large bulk of the deposits into the farm account came from Todd and Terryl.  The evidence also established that, even though Bror had signatory authority on the account, the vast majority of the checks were written by Bethany.

The record-keeping on the total cost of the improvements to the newer house on the homestead was anything but a model of clarity.  No ledger was kept for the farm account, and most of the bills for construction of the newer house were thrown away.  The amounts expended on the improvements were "pieced together" using checking account records, bills/invoices from

14

the providers/suppliers of materials, and the testimony of Bethany, Todd, and Terryl.  Much of

the testimony was centered around an Excel spreadsheet prepared by Todd for the trial.  See Ex.

EEEEE.

Some of the more "notable" transfers into the farm account are as follows:

- Check from Terryl to Bethany  – $8,000.00 (August 6, 2012);
- Check from Terryl to Bethany  – $7,000.00 (September 4, 2012);
- Check from Todd to Bethany – $30,000.00 (October 25, 2012);
- Several transfers from the Crabtrees totaling $11,779.00 (December 3, 2012 to September17, 2013).

In addition to the above transfers directly into the farm account, there were transfers

made by the Crabtrees and others that were made directly to contractors and/or suppliers, as

follows:

- A wire transfer from Dianne Merrifield (Todd's sister) – $19,990.00 to Pierce Log Homes (January 4, 2013);
- A check from Todd's National Bank account – $6,000.00 to Ugstad Plumbing (July 15, 2013);
- Transfer of 250 silver coins to Mike Harris (August 2013) that he cashed in for $6,375.00; of that amount, $2,353.47 was used to pay three outstanding bills.

The Trustee also points to the following checks, totaling $45,951.21, written by Bethany

from the farm account that were used to fund improvements to the homestead:

- Check No. 1017 for $3,630.00 to Don Schroder (August 21, 2012);
- Check No. 1018 for $5,000.00 to P.T. Design (August 21, 2012);
- Check No. 1021 for $500.00 to Haugen Heating & Cooling (September 2, 2012);
- Check No. 1028 for $2,000.00 to Pete Thiel (September 27, 2012);
- Check No. 1033 for $4,425.00 to Lake Region Electric Coop (October 23, 2012);
- Check No. 1037 for $14,000.00 to Pierce Log Homes (October 29, 2012);
- Check No. 1041 for $2,396.21 to L&M Fleet (November 5, 2012); and
- Check No. 1052 for $14,000.00 to Pierce Log Homes (December 3, 2012).

The Trustee specifically identifies the above transfers, which he claims correlate closely

to the time frames of the transfers made by the Crabtrees into the farm account, as being non-

15

exempt assets that were used to increase the Debtors' equity in the homestead.  He also asks that

the payment by Dianne Merrifield ($19,990.00), the payment by Todd to Ugstad Plumbing

($6,000.00), and the payments by Mike Harris ($2,353.47) be added to the amount of non-

exempt assets used to increase the equity to the homestead.  Thus, the Trustee is claiming that

the amount of $74,294.68[16] is directly traceable to improving the homestead property, and should

be disallowed under section 522(o).

## THE CRABTREES' OTHER LIABILITIES

Clinic Doctor, one of the Crabtree entities that provided online services and assistance to

chiropractic clinics in billing and regulatory compliance, entered into a joint venture with

another company, Maximized Living, LLC; it provided similar services in other parts of the

country.  The joint venture was known as Clinic Safe; Todd was the CEO of Clinic Safe.  He

also signed a personal guarantee to Maximized Living in the amount of $100,000.00.  Clinic

Safe eventually failed, and Maximized Living, in early December 2013, initiated collection

efforts against Todd to enforce the guarantee.

Todd and Terryl were also joint owners of an entity called TNT Crabtree LLC, a business

set up to own some business properties of the Crabtrees in Stillwater, Minnesota.  The Crabtrees

were also individually liable to the United States Small Business Administration ("SBA") on two

loans that were secured by property owned by TNT.  The SBA foreclosed on these properties in

the late summer/early fall 2013.  It then obtained a deficiency judgment against the Crabtrees for

$404,738.45.

---

[16]  The Trustee claims the total amount is $73,343.47; however, when one adds the total
amounts at issue, the figure is actually $74,294.68 [$45,951.21 + $19,990.00 + $2,353.47 +
$6,000.00].

16

Other debts reflected on the Debtors' Schedule F included credit card debt of $37,151.34,

owed to Discover Card; credit card debt of $33,875.83, owed to MBNA America; credit card

debt of $58,493.56, owed to National City (PNC); and a personal guarantee to US Bank in the

amount of $99,208.58, for a bridge loan/line of credit for Crabtree Law firm.  The total amount

of unsecured debt owed by the Crabtrees is $1,280.574.58.  See Ex. 3.

## ISSUES PRESENTED

**I.  Are the Debtors entitled to a general discharge of their debts?**

**A.  The UST's cause of action under 11 U.S.C. § 727(a)(2)(A).**

**B.  The UST's cause of action under 11 U.S.C. § 727(a)(3).**

**C.  The UST's cause of action under 11 U.S.C. § 727(a)(4)(A).**

**II. Are the Debtors entitled to claim the full amount of their homestead exemption?**

**III.  Are the Debtors entitled to claim as exempt certain items of personal property as**

**"tools of the trade" under Minnesota law?**

**IV.  Closing Remark.**

## PRELIMINARY MATTERS/EVIDENTIARY RULINGS

Although most of the parties' exhibits were received into evidence, either by stipulation

or without objection, there were a number of exhibits that were provisionally received by the

Court subject to certain objections.  The Court will now address the admissibility of those

exhibits.[17]

---

[17]  Any other discrete objection to admissibility by any party not specifically addressed
herein is **OVERRULED**.

*THE DEBTORS' OBJECTIONS TO THE UST's EXHIBITS*

At trial, the Debtors objected to the introduction of the UST's exhibits numbered 47, 60,

61, and 62; however, in a post-trial submission,[18] they withdrew their objections to all of these

exhibits, save Ex. 47 - a personal financial statement of Todd dated October 14, 2005.  The

Debtors' objection to this exhibit on the grounds of relevance is **OVERRULED**.  The

maintenance of certain records pertaining to the Debtors' assets is the subject of the UST's cause

of action under § 727(a)(3).  Further, Todd provided testimony later in the trial to explain the

contents of this exhibit.  Such exhibit is relevant.  See FED. R. EVID. 403.  The document is

admissible; the weight to be given it, however, lies within the discretion of the Court, as the

finder of fact.

The Debtors' comments regarding Ex. 67, the deposition transcript of Todd's testimony,

are well-taken.  Only those portions of the transcript that are reflected on the clerk's "Witness

and Exhibit Record"[19] will be considered.

*THE UST's OBJECTIONS TO THE DEBTORS' EXHIBITS*

The Debtors have withdrawn their request that Exhibits PPP, PPPPP, and LLLLLL be

admitted into evidence.  Accordingly, they will not be considered.

Exhibit RRRRR - Crabtree Individual Form 1098 for 2008:

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit

is received.

Exhibit SSSSS - Crabtree Individual Form 1098 for 2009:

---

[18]  ECF No. 85.

[19]  ECF No. 63, at 1, 2; ECF No. 65, at 4.

18

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit is received.

Exhibit VVVVV - Crabtree Individual Form 1098 for 2011:

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit is received.

Exhibit HHHHHH - Northwestern Mutual Life Insurance Policy - Surrender:

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit is received.

Exhibit JJJJJJ - Terryl's Security State Bank Check Ledger for 2012:

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit is received.

Exhibit KKKKKK - Terryl's Wells Fargo Check Ledger for 2013:

– Objections based on timeliness, relevance, and hearsay are **OVERRULED**; the exhibit is received.

Exhibit AAAAAA - Debtors' 1999 Giving Reports:

– Objections based on relevance and hearsay are **SUSTAINED**.  FED. R. EVID. 403 & 802.

Exhibit BBBBBB - Debtors' 1999 Tax Returns:

– Objections based on relevance and hearsay are **SUSTAINED**.  FED. R. EVID. 403 & 802.

Exhibit CCCCCC - 2011 Security Insurance Documents:

– Objections based on relevance and hearsay are **SUSTAINED**.  FED. R. EVID. 403 &

19

802.

Exhibit DDDDDD - 2011 Workers Compensation Audit Results:

– Objections based on relevance and hearsay are **SUSTAINED**.  FED. R. EVID. 403 &

802.

Exhibit EEEEE - 2013 Security Insurance Documents:

– Objections based on relevance and hearsay are **SUSTAINED**.  FED. R. EVID. 403 &

802.

## DISCUSSION

## I.

## OBJECTIONS TO DISCHARGE

The UST alleges that the defendants should be denied a discharge under

various subsections of 11 U.S.C. § 727, including § 727(a)(2)(A), § 727(a)(3), and

§ 727(a)(4)(A).  The UST did not proceed on Count Four of his amended complaint:  "The

United States Trustee's amended complaint contains four counts, including one count premised

on 11 U.S.C. § 727(a)(5).  The United States Trustee is not seeking judgment as to Count Four at

this trial."  ECF No. 40, n.1.

### Denial of Discharge, Generally

The discharge in bankruptcy is the foremost remedy to effectuate the "fresh start"

which is the primary goal and purpose of a debtor's relief in bankruptcy relief.  H.R.REP. No.

595, 95th Cong., 1st Sess. 384 (1977), U.S. Code Cong. & Admin. News 1978, p. 5787.

Because the denial of a discharge is an extreme remedy, the provisions of § 727 are to be

strictly and narrowly construed in favor of a debtor.  Kaler v. Charles (In re Charles), 474 B.R.

680, 683 (B.A.P. 8th Cir. 2012) (citing <u>Korte v. U.S. Internal Revenue Serv. (In re Korte)</u>, 262

B.R. 464, 471 (B.A.P. 8th Cir. 2001)).  Section 727 is intended to prevent a debtor's abuse of the

bankruptcy process.  <u>Id.</u>  The party objecting to the discharge must prove each element of a §

727 cause of action by a preponderance of the evidence.  <u>In re Charles</u>, 474 B.R. 680, 683-84

(B.A.P. 8th Cir. 2012) (citing <u>Allred v. Vilhauer (In re Vilhauer)</u>, 458 B.R. 511, 514 (B.A.P. 8th

Cir. 2011)); F<small>ED</small>. R. B<small>ANKR</small>. P. 4005.

On the one hand, denying a debtor a discharge admittedly is a harsh remedy.  <u>Allred v.

Vilhauer (In re Vilhauer)</u>, 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).  On the other hand, a

discharge in bankruptcy and the associated fresh start are privileges, not rights.  <u>Bauer v.

Iannacone (In re Bauer)</u>, 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing <u>Grogan v. Garner</u>, 498

U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is

limited to the honest but unfortunate debtor."  <u>Id.</u>

**A.      § 727(a)(2)(A)**

Section 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of

the estate charged with custody of property under this title, has transferred, removed,

destroyed, mutilated, or concealed, or has permitted to be transferred, removed,

destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the

petition[.]

11 U.S.C. § 727(a)(2)(A).  In particular, this cause of action requires proof that the debtor took

the actions with the intent to hinder, delay or defraud creditors.  See Wilson v. Walker (In re

Walker), 528 B.R. 418, 434 (B.A.P. 8th Cir. 2015) (chapter 7 debtor's conduct, after becoming

dissatisfied with performance of an individual who had induced him to enter into unconscionable

management services agreements that gave this individual a right to 50% of gross proceeds from

debtor's music singing career, in transferring his earnings to business run by his wife, did not

provide basis for denial of debtor's discharge on fraudulent pre-petition transfer theory; former

manager was not creditor with any valid claim against debtor, and debtor's conduct was not

intended to hinder, delay or defraud any other creditor; citing Georgen–Running v. Grimlie (In re

Grimlie), 439 B.R. 710, 716 (B.A.P. 8th Cir. 2010) (A § 727(a)(2) action requires proof that "the

debtor took the actions with the intent to hinder, delay or defraud creditors . . . .") (internal

quotation marks omitted) (quoting Sullivant v. Bieniek (In re Bieniek), 417 B.R. 133, 137

(Bankr. D. Minn. 2009)).

A presumption of fraud arises when a debtor has transferred valuable property without

payment.  In re Grimlie, 439 B.R. 710, 716 (B.A.P. 8th Cir. 2010).  And once a gratuitous

transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay,

or defraud his creditors.  Id.

As a general matter, property of the estate does not include assets owned by a corporation

in which the debtor holds an interest.  But the court may, under appropriate circumstances, pierce

the corporate veil when determining whether corporate property constitutes property of the

estate.  Doeling v. Toftness (In re Toftness), 439 B.R. 499 (B.A.P. 8th Cir. 2010).  More

specifically, corporate property can be treated as property of the estate pursuant to an alter ego

theory.  See, e.g., Seaver v. Burwell Family Ltd. P'Ship (In re Burwell), 391 B.R. 831 (B.A.P. 8th Cir. 2008).  In the Eighth Circuit, "the court can pierce the corporate veil and disregard the corporate facade when the corporate entity is the alter ego of the debtor and the debtors use corporate assets as their own, with no regard for corporate structure."  Id. at 835.  State law is to be consulted when determining whether the corporate veil should be pierced.  See, e.g., Stoebner v. Lingenfelter, 115 F.3d 576, 579 (8th Cir. 1997).

Under Minnesota law, a two-step analysis applies to determine whether an entity is the alter ego of an individual.  Burwell, 391 B.R. at 836.  The court is to consider "the relationship between the corporation and the individual, focusing on factors such as the failure to observe corporate formalities, siphoning of funds by the individual, absence of corporate records, and the existence of the corporation as merely a facade for the individual."  Id.  The next step of the analysis requires the court to consider "the nature of the relationship between the corporation and the party seeking to disregard it; the entity will be disregarded only if it has operated in a fraudulent or unjust manner toward that party."  Id.  If the veil can be pierced, corporate property becomes property of the estate.  Id. at 837.

The UST argues that the following transfers made by the Debtors within one year of their bankruptcy filing were fraudulent:

1.    500 silver coins to Firestarters – September 2013;

2.    250 silver coins to Mike Harris – August 31, 2013;

3.    Terryl's interest in a 2003 Ford F-150 to Bror – Nov. 4, 2013;

4.    Todd's interest in a Toyota RAV4 to Gunnar – May 29, 2013; and

5.    Certain transfers made by the Debtors through Crabtree Law Firm.

It is undisputed that each of the transfers set forth above was made within one year of  December 16, 2013, the date Mr. and Mrs. Crabtree filed their bankruptcy petition.  The evidence also clearly established that the Debtors made each of the transfers, with the possible exception of the transfers made through Crabtree Law Firm.  On these transfers, the UST is urging that the law firm was a mere alter ego of the Debtors, and that the property transferred was actually property of the estate.  The only other issues that remain are whether the Debtors received any consideration for the transfers; if they did not, under Grimlie, the transfer is presumed gratuitous, and the burden then shifts to the Debtors to show that the transfer was not made with the intent to delay, hinder, or defraud their creditors.  Each of the above issues will be addressed in turn.

### 1.      Transfer of the Silver Coins to Firestarters.

In early September 2013, approximately three months before they filed for chapter 7 relief, the Crabtrees donated a box of 500 silver coins, valued at $12,000.00, to Firestarters.  Also that same year, they gave the church another $4,750.00.  The coins were not designated for any special purpose, and Mr. Thiel, the pastor at Firestarters, testified that the church was looking at the coins as an investment, and that the church still maintained possession of them.  The Crabtrees received no consideration in return for the silver coins; clearly, it was a charitable contribution.

The Crabtrees had been attending church services since March 2012.  A review of their personal federal tax returns from 2009 to 2012 showed no yearly contributions to charity exceeding $8,450.00.  Mr. Thiel testified that the silver coin contribution was in lieu of their regular monthly contributions.  There was no testimony or other evidence regarding Firestarters' policy on tithing, if any, or whether a member's ability to attend services there or otherwise

24

participate in the church's activities was dependent on one's monetary contributions to the church.

Both Todd and Terryl testified at trial that they felt that giving the coins to the church was the "right" thing to do.  Todd even indicated a desire to give to the church rather than make any more payments to CAG:  "I am going to make sure that my obedience to God comes before anything else.  And that's what I started doing.  I started saying, okay, the first fruits of what I produce, they belong to God, not the first fruits belong to CAG the first fruits belong to God." (6-15-16 transcript, pp. 143-44).  Terryl also expressed a similar motivation:

> Well, I guess it's more a concept that those coins actually belonged to us or
> are they God's to begin with?  And we're supposed to put them where they're
> supposed to be.  And, when we cashed out our retirement and our life insurances,
> those coins were designated for ministry, and, at that time, at that moment, we
> believed that is what God wanted us to do.  I did – I honestly did not give [CAG]
> like a thought that day or at that moment.  It was a God thing, not a creditors/
> [CAG] thing.

(6-15-16 transcript, p. 158, lines 17-25).

All of this leads to the Debtors' asserted defense to the UST's cause of action under § 727(a)(2)(A) based on the Religious Freedom Restoration Act ("the RFRA");[20] they argue that the RFRA restricts the application of the bankruptcy statute to the alleged fraudulent nature of the transfer of the coins.  In other words, the Crabtrees claim that the Bankruptcy Code cannot be interpreted to place a substantial burden on a person's exercise of religion, including giving to a church of one's choice.  "The 'exercise of religion,' as defined in 41 U.S.C. § 2000cc-5, has been interpreted by the Eighth Circuit to include a person giving to a church of his or her choice."  See Defendants' Pre-Trial Br. ECF No. 39, at 11.  In support of that proposition, they cite to the

---

[20]  42 U.S.C. §§ 2000bb et seq.

Eighth Circuit case of In re Young, 141 F.3d 854 (8th Cir. 1998) *on remand*.[21]

In 1993, Congress enacted the RFRA in response to Employment Division v. Smith.
494 U.S. 872 (1990).  In Smith, the Supreme Court addressed whether the Free Exercise Clause
of the First Amendment allowed the state of Oregon to deny unemployment benefits to two
members of the Native American Church who were fired from their jobs because of their
sacramental, yet state-law prohibited use of peyote.  Id.  There, the Court "held that, under the
First Amendment, 'neutral, generally applicable laws may be applied to religious practices even
when not supported by a compelling governmental interest.'"  Burwell v. Hobby Lobby Stores,
Inc., 134 S. Ct. 2751, 2761 (2014) (citing City of Boerne v. Flores, 521 U.S. 507, 514 (1997)).
In so holding, Smith departed from the Court's previously employed compelling interest test
articulated in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205
(1972), which, if not departed from, "would have asked whether Oregon's prohibition
substantially burdened a religious practice, and, if it did, whether the burden was justified by a
compelling government interest."  Boerne, 521 U.S. at 513 (specifically referencing Sherbert).
This reduction of scrutiny by the Court prompted Congress to act, with explicit goals.

By enacting the RFRA, Congress sought to expand the protection for religious exercise
beyond the protections of the First Amendment in the face of Smith's effect on limiting the
exercise of religion.  As recognized in Holt v. Hobbs, 135 S. Ct. 853, 859-60 (2015), the Court
expressed, "Following our decision in Smith, Congress enacted RFRA in order to provide
greater protection for religious exercise than is available under the First Amendment."  In Hobby

---

[21]  The complete history of this case is found at:  In re Young, 82 F.3d 1407 (8th Cir.
1996), *reh'g and suggestion for reh'g en banc denied*, 89 F.3d 494 (8th Cir. 1996), *vacated,* 521
U.S. 1114 (1997).

Lobby, 134 S. Ct. at 2760, the Court stated, "Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty."  Congress, along with other findings, found that, "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise[.]"  42 U.S.C. § 2000bb.  Indeed, the RFRA boldly pronounced its purposes, which includes restoring the compelling interest standard used before Smith.[22]

Under the RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b).  Courts have understood that to establish a claim under the RFRA, the claimant must "show the law in question substantially burdens the [ claimant's] sincere religious exercise."  Sch. of the Ozarks, Inc. v. U.S. Dep't. of Health and Human Servs., 86 F. Supp. 3d 1066, 1071-72 (W.D. Mo. 2015) (citing Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006)).  Once shown, "the burden then shifts to the government to show the law uses the least restrictive means to further a compelling government interest."  Id.

---

[22] The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b).

27

To the Debtors' credit, they acknowledge that In re Young dealt with 11 U.S.C. §

548(a)(2)(A), the statute that defines a trustee's avoidance powers, "but the Court's reasoning is

equally applicable to a 727(a)(2)(A) cause of action . . . ."  A brief discussion about In re Young

lays a foundation to show why the Debtors' defense is misplaced.  In In re Young, the Eighth

Circuit held that the RFRA "engrafted" its statutory demands onto 11 U.S.C. § 548(a)(2)(A).  In

re Young, 141 F.3d at 861.  After upholding the RFRA's constitutionality as applied to federal

laws, the Eighth Circuit reinstated its previous decision.  Id. at 863.  Its previous decision

reasoned that the "RFRA  provides a defense against the order of the district court permitting the

trustee to avoid the debtors' contributions to the church under 11 U.S.C. § 548(a)(2)(A)."  In re

Young, 82 F.3d 1407, 1420 (8th Cir. 1998).  At issue there, though, was an avoidance action

under the constructive fraud portion of 11 U.S.C. § 548(a)(2)(A) at the time, that, rather than

requiring actual fraud, requires that the debtor received less than reasonable equivalent value,

along with other requisites.  Id. at 141.  These foundational pieces help explain why the

reasoning of In re Young does not apply in equal force to § 727(a)(2)(A).

Section 727(a)(2)(A) differs from § 548 both in function, and in consequence.  In

consequence, § 727(a)(2)(A) bars a debtor the privilege of a discharge, while § 548 provides a

trustee the power to avoid a qualifying transfer.  In function, § 727(a)(2)(A), "reinforces an

affirmative prohibition against fraudulent transactions and other activities designed to injure

creditors by denying access to potentially valuable assets."  W. Norton & W. Norton,

BANKRUPTCY LAW AND PRACTICE § 86:4 (3d ed. 2016).  As for § 548, its function "is to prevent

depletion of the estate and to achieve fairness to all creditors by recovering for creditors property

which was improperly conveyed."  Joan N. Feeney, Michael G. Williamson, Michael J. Stepan,

BANKRUPTCY LAW MANUAL § 9A:29 (5th ed. 2016). These differences in consequence and function highlight whatever force of <u>In re Young</u> has on § 548 is not entirely, if at all, felt by § 727(a)(2)(A).

More particularly, the circumstances that ultimately culminated into <u>In re Young</u> did not deal with the actual fraud portion of § 548, which bears resemblance to § 727(a)(2)(A), but dealt with the constructive fraud portion of § 548. The constructive fraud portion addresses certain transfers made for less than reasonably equivalent value, rather than transfers made with the actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a). Strikingly, the charitable contribution safe harbor – which was enacted after <u>In re Young</u> – expressly only applies to the constructive fraud portion of § 548(a). § 548(a)(2) ("a transfer of a charitable contribution . . . shall not be considered a transfer covered under paragraph (1)(B) in any case  in which . . . ."). This constructive fraud component is not a part of § 727(a)(2)(A), which has language that bears closer resemblance to actual fraud by requiring an act worthy of denial of discharge to be done "with the intent to hinder, delay or defraud" creditors. § 727(a)(2)(A). These distinctions show the misplacement of the Debtors' argument.

The Crabtrees contend that, under the RFRA, "the transfer of $16,750[23] to the Debtors' church in 2013 does not form a basis to deny the Debtors' discharge." ECF No. 84 at 36. Invoking the RFRA in a conclusory way leaves absent information to satisfy the requirements of the RFRA. Therefore, the RFRA used in this manner does not impact the Debtors' discharge.

For these reasons, the Debtors' arguments with respect to the RFRA's interaction with

---

[23] It is not the full amount of the $16,750.00 worth of charitable contributions to Firestarters that the UST is challenging; rather, it is just the $12,000.00 worth of silver coins that were transferred.

§ 727(a)(2)(A) is simply an exaggeration that lacks sufficient merit.  Therefore, the transfer of

the 500 silver coins to Firstarters, in September 2013, was done with the intent to hinder, delay,

or defraud the Crabtrees' creditors.

**2.  Transfer of the Silver Coins to Mike Harris**.

The Debtors disclosed on their statement of financial affairs that they transferred 250

silver coins to Mike Harris on August 31, 2013, and that the transfer was made "to pay

construction bills  related to debtors' home."  Todd testified that he gave Mike Harris the coins

as compensation for work he had done on the house, yet, Mike Harris testified that he didn't

expect to get paid for his work.  The record shows that Mike Harris cashed in the coins at a

Fargo coin dealer for $6,375.00, of which $2,353.47 was used to pay outstanding invoices

related to the construction of the Debtors' house.  The rest went into the joint personal account of

Mike and Bethany.  Further suspicion is cast upon this transfer given Todd's testimony that he

had also marked a box of coins, like he did for Bror and Gunnar, as a gift to "Breezy."  "So, like

I said, I was reconfiguring the priority of the creditors that we had.  And so we had the silver.

My daughter, Breezy's name was on the box.  It was one that I was planning on giving to her but

never delivered to her.  So it was like, okay, it was meant for her anyway.  And we have all of

these bills.  It just made sense to me that we could give those coins to her and Mike to use to pay

for the outstanding bills."  (6/23/15 transcript, p. 19, lines 1-8).

The transfer of the silver coins was done within one year of the Debtor's filing; it was

done without any consideration to the Debtors, and it was done with the intent to hinder, delay,

or defraud.

**3.  Transfer of Terryl's Interest in the 2003 Ford F-150.**

30

The Debtors did not disclose on their statement of financial affairs, the transfer, on
November 4, 2013, of Terryl's interest in this vehicle to her son, Bror.  At the February 3, 2014
meeting of creditors, neither Todd nor Terryl mentioned this transfer of title to Bror.  Todd
testified that the 2003 Ford F-150 had been "totaled," and that the proceeds from that vehicle
were used to purchase a different vehicle – a 2007 Ford F-150; however, that was not true.  It
wasn't until the next continued meeting of creditors, March 3, 2014, when pressed by the
Trustee, that the Crabtrees admitted that it was the 1999 Ford pickup that was totaled, not the
2003 Ford.  They also stated that the 2003 vehicle had been titled in both Terryl's and Bror's
name.  They also testified that title was transferred to Bror because he had moved to Wisconsin;
however, the record reflects that Bror moved from the rental at Lake Lida to Wisconsin the
spring of 2013, well before November of that year.  At the time of the title transfer, Terryl did
not receive any compensation for her interest in the vehicle.

The "shifting landscape" of the Debtors' explanation of the circumstances surrounding
the ownership of the 2003 Ford F-150 pickup, coupled with their failure to disclose the transfer
of title to Bror – in their bankruptcy filing – is indicative of fraudulent intent.  The burden having
shifted to them to establish a lack of such intent, and their explanation(s) having fallen short of
that burden, it appears that such transfer was done with the intent to hinder, delay, or defraud
their creditors.

### 4.  Transfer of the 2004 Toyota RAV4.

Nowhere on their bankruptcy schedules or statement of financial affairs did the Crabtrees
disclose the transfer of the RAV4 to Gunnar.  The first mention of the transfer was at the meeting
of creditors on February 3, 2014 where they indicated that the vehicle was "sold" to Gunnar.

They also admitted that they received nothing from either Gunnar or Lindsay in return for the transfer of title. This, despite the listing of the sale price as $5,000.00 on the title transfer document. Ex. 73. They also testified that the RAV4 was transferred to Gunnar as compensation to Lindsay for her full-time work at Clinic Doctor. Ex. 60 at 35, lines 4-7.

However, at the continued meeting of creditors on May 22, 2014, the story changed. They testified that Lindsay worked for Crabtree Law Firm, and insinuated that the vehicle was given to Gunnar for Lindsay's work for the law firm; however, there were never any records produced that showed that Lindsay worked for Crabtree Law Firm (let alone that she was owed $5,000.00), and that she never received an IRS Form W-2 from the law firm. In fact, Lindsay herself testified that she worked "99%" of her time working on Clinic Doctor matters. It is simply not plausible that she was owed money by Crabtree Law Firm at the time of the transfer.

The fact that the transfer of the RAV4 was made to any insider, within one year of the filing of the Debtors' petition, and that no records were ever produced to support the Crabtrees' story regarding the circumstances of the transfer, it was very likely done with the intent to hinder, delay or defraud the Debtors' creditors. Simply stated, the Crabtrees were unable to satisfactorily explain the failure to list this transfer in their bankruptcy filings.

### 5. Certain Transfers Made by the Debtors through Crabtree Law Firm.

As discussed previously, the Crabtrees purchased vehicles for the use of themselves as well as their family members. Title to these vehicles was listed in the names of Crabtree Law Firm, Clinic Doctor, themselves, or some combination thereof. The corporate entities made loan payments on the vehicles. Todd and Terryl used them almost interchangeably – for their business as well as for their personal needs. Their children did, too.

32

The Toyota RAV4 was owned by Crabtree Law Firm and Todd.  It was driven by Terryl, and later by Gunnar and Lindsay.  All three used the vehicle for both personal and business purposes.  Crabtree Law Firm made the loan payments as well as paid for routine maintenance. The vehicle was eventually transferred to Gunnar, purportedly for work performed by Lindsay for Crabtree Law Firm; however, there were no records to support such claim.

The 2007 Toyota FJ Cruiser was driven first by Terryl, and later by Mike and Bethany. It was jointly owned by Clinic Doctor and Terryl.  All of these individuals used the Toyota for personal and business reasons.  The company paid for routine maintenance as well as the loan payments.

The 2007 GMC Yukon was owned by Crabtree Law Firm.  Again, it was driven at first by Terryl, and then later by Mike and Bethany.  In point of fact, during this time frame, the Harrises did not own any vehicles in their own right; they used only the Toyota FJ Cruiser and the GMC Yukon.  And, like the other vehicles, the law firm paid for routine maintenance and the monthly loan payments.  The GMC Yukon was transferred, in August 2013, without consideration, to Mike Harris.  According to the Crabtrees, the transfer was made as and for work Mike Harris had performed on behalf of Crabtree Law Firm, yet no records were produced to support this assertion.  Mike Harris testified that he never received an IRS Form 1099 from the law firm, nor did he expect any payment from it.

Crabtree Law Firm, less than a month prior to the petition date, paid Schmit Moving $10,000.00 to assist in the cost of moving the "St. Paul Building" onto land owned by the church.  This transfer was a personal contribution of the Crabtrees to their church.  There was no evidence at trial that any space in the building was being used as an office for Crabtree Health

Law, as intimated in particular by Todd's testimony that such would be the case. The law firm also paid Studio Consultants, on October 22, 2013, the sum of $3,649.00, purportedly to improve the sound system in the church. Neither the law firm, nor the Crabtrees received any consideration for either of these transfers.

The circumstances surrounding the termination of Crabtree Law Firm, and the almost contemporaneous formation of Crabtree Health Law, is suspect. The Crabtree Law Firm's accounts were being levied upon by CAG, hence the creation of Crabtree Health Law. Yet, post-petition, the accounts receivable from the law firm Crabtree Law Firm were deposited into the account of Crabtree Health Law. Further, those funds were used to pay Terryl, and to pay ongoing expenses of Crabtree Health Law – not for paying the creditors of Crabtree Law Firm. Once again, a common theme was playing itself out here – there were no corporate formalities being followed.

Based on the above analysis, the Court finds that Crabtree Law Firm was merely a "facade," and that it served as the alter ego of Todd and Terryl. Based on the factors set forth in Burwell, the Court finds a sufficient basis to pierce the corporate veil; the assets transferred by Crabtree Law Firm were property of the estate. The transfers were designed to benefit the Crabtrees – at the expense of their and the law firm's creditors.

**B.**   **§ 727(a)(3)**

Section 727(a)(3) states:

(a) The court shall grant the debtor a discharge, unless—

. . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to

> keep or preserve any recorded information, including books, documents,
> records, and papers, from which the debtor's financial condition or
> business transactions might be ascertained, unless such act or failure to act
> was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

A debtor may be denied a discharge pursuant to § 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified under all the circumstances of the case. Riley v. Riley (In re Riley), 305 B.R. 873, 882 (Bankr. W.D. Mo. 2004). Debtors are required to keep adequate financial records to enable parties and the court to trace the debtor's financial history, to reconstruct financial transactions, and to test the completeness of the disclosure requirements. Fokkena v. Huynh (In re Huynh), 379 B.R. 865 (Bankr. D. Minn. 2008).

Intent is not an element of a § 727(a)(3) claim. In re Sendecky, 283 B.R. 760, 764. (B.A.P. 8th Cir. 2002). Instead, § 727(a)(3) "imposes a standard of reasonableness." Davis v. Wolfe (In re Wolfe), 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999). A debtor's discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition. In re Riley, 305 B.R. at 882. "The debtor is 'required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate.'" In re Wolfe, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999) (quoting First State Bank of Newport v. Beshears (In re Beshears), 196 B.R. 468, 474 (Bankr. E.D. Ark. 1996) (quoting Koufman v. Sheinwald, 83 F.2d 977 (1st Cir. 1936)).

Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of

them.  Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005).   In order to determine whether a failure to keep adequate records is justified, the Court must determine "what records someone in like circumstances" would keep.  In re Sendecky, 283 B.R. at 764.  Typical factors for consideration include the debtor's educational level, sophistication, and level of business experience.  Id.  In general, the more complex a debtor's financial affairs, the more records must be kept.  See, e.g., In re Martin, 124 B.R. 542, 543 (Bankr. N.D. Ind. 1991).   For example, where a debtor maintains financial records that allows for the reconstruction of an individual's or company's financial history, denial of a discharge under § 727(a)(3) would be improper.  See, e.g., Fokkena v. Huynh (In re Huynh), 379 B.R. 865 (Bankr. D. Minn. 2008) (holding that lack of documentation of gambling losses and transfers was insufficient to deny debtor a general discharge under § 727(a)(3) where debtor maintained substantial documentation of her financial transactions to allow for their reconstruction).

Once the party seeking denial of the discharge has shown that the debtor's records are inadequate, the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim.  Wilson v. Walker (In re Walker), 528 B.R. 418, 434-35 (B.A.P. 8th Cir. 2015) (failure on part of chapter 7 debtor's wife to maintain detailed financial records when, following dispute between debtor and former manager who induced him to enter into unconscionable management services agreements, she agreed to manage debtor's singing career and to receive proceeds of his singing engagements, was understandable and justifiable in light of wife's recordkeeping abilities and surrounding circumstances, and did not warrant denial of debtor's chapter 7 discharge based on inadequacy of his financial records; citing McDermott

v. Swanson (In re Swanson), 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012) (citations omitted) (once

the party seeking denial of the discharge "has shown that the debtor's records are inadequate, the

burden of production shifts to the debtor to offer a justification for his record keeping (or lack

thereof); however, the objecting party bears the ultimate burden of proof with respect to all

elements of this claim")).

In summary, once the plaintiff shows that the debtor's records are inadequate, the debtor

needs to show that the record keeping (or lack thereof) was justified under the circumstances.

Wilson v. Walker (In re Walker), 528 B.R. 418, 435 (B.A.P. 8th Cir. 2015) (once the party

seeking denial of the discharge has shown that the debtor's records are inadequate, the burden of

production shifts to the debtor to offer a justification for his record keeping (or lack thereof);

however, the objecting party bears the ultimate burden of proof with respect to all elements of

this claim); In re Sendecky, 283 B.R. at 764 ("Once the plaintiff proves the records are

inadequate, the burden of production 'shifts to the debtor to prove that failure to keep adequate

records was justified under the circumstances'" (citing In re Pulos, 168 B.R. 682, 690 (Bankr. D.

Minn. 1994))).  In the end, the plaintiff bears the ultimate burden of proof with respect to all

elements of the claim.  McDermott v. Swanson (In re Swanson), 476 B.R. 236, 240 (B.A.P. 8th

Cir. 2012).

**1.  Documentation for Transfer of Interest in Crabtree Brothers.**

On Schedule B of his bankruptcy schedules, Todd claimed he owned 50% of Crabtree

Brothers, an entity that Todd owns with his brother, Paul Crabtree.  The Crabtree Brothers owns

four parcels of land in Colorado.  Yet, according to Todd's personal federal tax return, he owned

75% of Crabtree Brothers.  In his deposition testimonies, and then again at trial, Todd changed

his story, claiming that he no longer owned any interest in the entity. He said that his

accountant, Dudley Ryan, had prepared an amended return for tax year 2013; yet this amended

return had not been filed as of April 28, 2015.

Despite all the testimony, the evidence suggests that Todd owned either a 50% interest in

Crabtree Brothers, or that he owned a 75% interest. The only record, or documentary evidence,

if you will, that suggests anything to the contrary is a short email exchange between the Crabtree

Brothers that occurred in April 2009, See Ex. P.

Dudley Ryan, Todd's accountant of some twenty years, testified at his deposition that

Paul Crabtree, in November 2014, contacted him and requested that the 2013 tax return of

Crabtree Brothers be amended to reflect that Todd had no interest in that entity. The amended

return reflected that. Ex. 44.[24]

In Todd's deposition, taken in January 2015, he testified that the amended return for

Crabtree Brothers had been filed prior to his personal income tax return for 2013; however, that

was not true. At the trial, when asked whether the amended return had been filed with the IRS,

Todd had the following exchange with counsel for the UST:

> Q: You said that it's being amended? That – does that mean that the amended
>
> return has not been filed yet?
>
> A: I don't know. It's in my brother's possession. It's been signed by the CPA
>
> and is in his possession, so . . . .
>
> Q: Had it been filed as of last week?
>
> A: I don't believe so. I think I just got it to him yesterday. I received it yesterday

---

[24] This exhibit was not received into evidence. It's reference here is used to show the
impeachment of Todd by the UST, and for no other purpose.

from my attorney.

Q: And you're referring to the amended 2013 tax return for Crabtree Brothers?

A: That's correct.

(4-28-2015 transcript, p. 42, lines 5-14).

As has previously been noted, Todd is an attorney, a chiropractor, holds an MBA degree, owns (or has owned) several businesses, and is a very sophisticated businessman. His post-petition attempt at covering up his ownership interest in Crabtree Brothers is disingenuous. Thus, his failure to explain the lack of records of this purported transfer of his interest in Crabtree Brothers is clearly inadequate.

## 2. Records Pertaining to an Accounting of the Ralph Blohm Estate.

The UST seeks to deny Mr. Crabtree a discharge because he has been "[un]able to produce a complete accounting that can be independently verified by reference to bank statements and check images." UST's Post-Trial Br. at 37. Specifically, the UST points to Ex. 26, Woodland National Bank statements from January 2013 to January 2014. However, Todd produced several exhibits pertaining to the Blohm estate, to wit: DD – Ralph Blohm's Financials; EE – Draft Inventory in Ralph Blohm Estate; FF – 2-20-15 E-Mails in Ralph Blohm Estate; HH – Spread Sheet for Blohm Probate Assets; II – Draft Final Account of Mr. Blohm Est.; JJ – St. Emp. ID in Ralph Blohm Estate, and KK – Accounting for Blohm House.

While many of these exhibits are "drafts," or may not be subject to "verification," as the UST suggests, they did not materially affect the UST's ability to glean such information as necessary for a determination of the financial impact on Todd's financial situation. Indeed, as has already been established, Todd received an inheritance from the Blohm estate, which he used

39

to enhance the equity position in his homestead.  Accordingly, the UST's request for denial of discharge on this basis is denied.

### 3.      Records regarding transfer of the Toyota RAV4 to Gunnar.

The UST urges denial of a discharge to the Debtors because of a failure to maintain adequate records to show the reasons for the transfer of the RAV4 to Gunnar.  The Court agrees. Although both Terryl and Todd testified that the vehicle was transferred to their son for compensation earned by Gunnar's wife, Lindsay, they were unable to produce records from Crabtree Law Firm to justify this explanation.  Todd is not only an attorney, but holds other advanced degrees, and by his own testimony, is a long-time businessman.  The record is devoid of any time period for which the wages were earned, or any specifics as to the exact amount owed her at the time of the transfer to Gunnar.  The "bottom line" here is that as a well-educated and sophisticated businessman, Todd did not maintain adequate records to support his and Terryl's explanation about the circumstances surrounding the transfer of the RAV4.  The UST has satisfied his burden on this cause of action under § 727(a)(3).

### 4.  Records Regarding Transfer of the 2007 GMC Yukon to Mike Harris.

Here again, the Crabtrees explanation as to why the GMC Yukon was transferred, when placed under closer scrutiny, just doesn't hold up.  Mike Harris testified that prior to the transfer he and his wife, Bethany, used the vehicle for both business and personal reasons.  He also testified that he never received an IRS Form 1099 or IRS Form W-2 from Crabtree Law Firm, nor did he expect any payment from the law firm.  The Debtors were unable to document any of their assertions that would substantiate their claim that the transfer was done for adequate consideration.  For the same reasons that have been recited herein for the RAV4, the Debtors

40

will be denied a discharge for failure to produce adequate records regarding the transfer of the GMC Yukon.

### 5. Documentation Regarding the Liquidation of the Retirement Accounts.

The UST also asks that the Debtors' discharge be denied for the failure to keep or preserve documents regarding the liquidation of various retirement accounts. The disposition of the accounts in question range from April 2009 (Templeton Stock) to September 2011 (North American Bank stock). These transactions go back over two years prior to the date of the petition, and are just too attenuated when compared to the more recent financial circumstances of the Debtors. Accordingly, the UST has failed to meet his burden on this cause of action.

### 6. Documentation Regarding the Transfer of Silver Coins to Mike Harris.

The record is clear that the Debtors acquired 2,500 silver coins in that period of time from November 2009 through January 2010. According to them, 250 coins, worth $6,375.00, were given to Mike and Bethany in September 2013. The coins were given purportedly to them because Mike was owed money from Crabtree Law Firm, yet the Crabtrees were unable to produce any documentation to support that assertion. The Crabtrees also testified that they gave to their sons, Gunnar and Bror, each a box of 500 coins. There was no consideration given by either of them. Again, there was no documentation to reflect these gifts. Finally, the Debtors testified that a box of 500 silver coins was given to their church, Firestarters. Putting aside the issue of whether the Debtors have met their burden to produce sufficient documentation to accurately reflect the transfers to Mike Harris, Bror, and Gunnar, there remains the question of

what happened to the other 750 silver coins.  In early 2010, Todd and Terryl had 2,500 silver

coins in their possession; 250 coins were given to Mike and Bethany; 500 coins were given to

Bror; 500 coins were given to Gunnar; and 500 coins were given to Firestarters.  That leaves 750

coins that are unaccounted for.  The UST has established all the requisite elements to deny the

Debtors their discharge on this cause of action.

### C.   § 727(a)(4)(A)

Section § 727(a)(4) provides:

The court shall grant the debtor a discharge, unless– ***

(4) the debtor knowingly and fraudulently, in or in connection with the case--

(A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A).  To establish a false oath under § 727(a)(4)(A), which provides for

denial of a Chapter 7 debtor's discharge for having made a false oath or account, the creditor

must prove that:  (1) debtor made a statement under oath; (2) the statement was false; (3) debtor

knew the statement was false; (4) debtor made the statement with fraudulent intent; and (5) the

statement related materially to debtor's bankruptcy case.  In re Freese, 460 B.R. 733 (B.A.P. 8th

Cir. 2011) (bankruptcy court's finding that debtor made material false statements under oath, as

warranted denial of his discharge, was supported by the record).

Section 727(a)(4)(A) bars the entry of a discharge if a debtor knowingly and fraudulently,

in or in connection with a case, made a false oath or account.  The Bankruptcy Code, through

section 727(a)(4)(A), "requires nothing less than a full and complete disclosure of any and all

apparent interests of any kind."  Korte v. U.S. Internal Revenue Serv. (In re Korte), 262 B.R.

464, 474 (B.A.P. 8th Cir. 2001) (quoting Fokkena v. Tripp (In re Tripp), 224 B.R. 95, 98 (Bankr.

N.D. Iowa 1998)).  A debtor's signature on the petition, made under penalty of perjury, is a

declaration which has the force and effect of an oath of the kind encompassed by section

727(a)(4)(A).  Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) (overruled

on other grounds); Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).

"The debtor's duty of disclosure requires updating schedules as soon as reasonably practical

after he or she becomes aware of any inaccuracies or omissions."  Bauer v. Iannacone (In re

Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003).

"The effectiveness of the bankruptcy system depends on the Debtor's complete candor,

and it is not the job of the trustee or creditor to search for information about the Debtor that

should be readily disclosed in his bankruptcy Schedules and Statements."  In re Freese, 460 B.R.

733, 739 (B.A.P. 8th Cir. 2011); Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992) ("The petition,

including schedules and statements, must be accurate and reliable, without the necessity of

digging out and conducting independent examinations to get the facts.") (interior quotations

marks and citations omitted); In re Cecil, 542 B.R. 447 (B.A.P. 8th Cir. 2015) (the Bankruptcy

Code requires a debtor to provide the court, the trustee, and the creditors with a complete picture

of her assets and liabilities).

"[T]o have a cause of action for a false oath under § 727(a)(4), the statement needs to be

material and made with intent."  Wilson v. Walker (In re Walker), 528 B.R. 418, 435 (B.A.P. 8th

Cir. 2015) (to the extent chapter 7 debtor's bankruptcy schedules were inaccurate, insufficient

evidence was presented that any such inaccuracies were material or made with requisite intent to

deceive, such that they did not provide basis for denial of debtor's discharge on "false oath"

theory; citing Korte v. Internal Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir.

2001) (citing Mertz v. Rott, 955 F.2d 596, 597-98 (8th Cir. 1992))).

For a plaintiff's § 727(a)(4) cause of action to succeed, the debtor's false oath or

omission must be material.  "'The subject matter of a false oath is "material" and thus sufficient

to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or

concerns the discovery of assets, business dealings, or the existence and disposition of his

property.'"  In re Freese, 460 B.R. 733, 739 (B.A.P. 8th Cir. 2011) (quoting Chalik v. Moorefield

(In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (per curiam) (quoted in Mertz, 955 F.2d at 598

and Palatine Nat'l Bank of Palatine, Ill. v. Olson (In re Olson), 916 F.2d 481, 484 (8th Cir.

1990))).  "The value of the undisclosed asset does not determine whether the subject matter of

the false oath is material and failure to disclose even an asset with minimal value may be

material."  In re Freese, 460 B.R. 733, 739 (B.A.P. 8th Cir. 2011).

The proper functioning of the entire bankruptcy process is dependent upon debtors

providing complete, accurate and reliable information in the petition and other documents

submitted with the filing of the case so that parties in interest may evaluate the debtors' assets

and liabilities and appropriately administer the case.  In re Bren, 303 B.R. at 613-16. Section

727(a)(4)(A) promotes veracity in the statements and schedules to help prevent creditors and the

trustee from having to resort to independent fact-finding and investigation.  Daniel v. Boyd (In re

Boyd), 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006).  The disclosure requirement has

implications beyond the administration of each individual bankruptcy case.  "The failure to

comply with the requirements of disclosure and veracity necessarily affects the creditors, the

application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well

as the judicial system as a whole."  National Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R.

44

739, 742 (Bankr. W.D. Ark. 1997).

The Bankruptcy Appellate Panel for the Eighth Circuit BAP ("Eighth Circuit BAP")

fairly recently affirmed a denial of discharge on facts somewhat similar to those in the case at

hand, stating:

> Moreover, "[a]s §727(a)(4)(A) makes clear, 'the Code requires nothing less than a
> full and complete disclosure of any and all apparent interests of any kind.'"
> Korte, 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (quoting Fokkena v. Tripp (In re
> Tripp), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)) (citation omitted).  It is crucial
> to the effectiveness of the bankruptcy system that the Debtor proceed with
> complete candor.  The Trustee should not be required to conduct his own
> investigation to discover the facts.  See Mertz, 955 F.2d at 598 ("The petition,
> including schedules and statements, must be accurate and reliable, without the
> necessity of digging out and conducting independent examinations to get the
> facts.")[.]

Kaler v. Charles (In re Charles), 474 B.R. 680, 686-87 (B.A.P. 8th Cir. 2012).

## 1.  The Toyota RAV4.

The Crabtrees failed to disclose on the statement of financial affairs the transfer of the

RAV4 to Gunnar.  This omission was then compounded by the testimony of both Todd and

Terryl as they "shifted" their story.  At the meeting of creditors held on February 3, 2014, they

told the Trustee that they had "sold" the vehicle – that was not true.  Eventually, they admitted

that the RAV4 was given to their son, Gunnar, just a few months before they filed their

bankruptcy petition, as compensation for money owed to his wife Lindsay, for work that she had

done for Clinic Doctor.  However, the story again "morphed."  At the continued meeting of

creditors, on May 22, 2014, the Crabtrees testified that the transfer was for work that Lindsay

had done for Crabtree Law Firm, not Clinic Doctor.  This was very telling inasmuch as it was the

law firm, and not Clinic Doctor, that had the interest in the vehicle.  However, when asked to

produce documentation showing that Lindsay had performed work for Crabtree Health Law, the

Crabtrees were unable to come up with any.  Indeed, Lindsay testified that she had no

discussions with Todd regarding any separate compensation for her work for the law firm.

The Crabtrees also tried to "legitimize" the transfer by producing an IRS Form 1099

issued to Gunnar, that purports to show the value of the RAV4.  This was done well after the

fact, and is even contradictory as to the value of the vehicle when one looks at the transfer

documents – one showing the value to be $4,000.00, and another value to be $5,000.00.  See Ex.

TTTT.

In sum, none of the various "versions" of the circumstances surrounding the transfer of

the Toyota RAV4 to Gunnar does anything to ameliorate the falsity of the failure to disclose the

transfer.

Based upon the foregoing facts, the Court finds that the failure to disclose the transfer of

this vehicle on the statement of financial affairs was a false oath; that it was made with

fraudulent intent; and that it was material.  Accordingly, because of this false oath, grounds exist

for denial of the Debtors' discharge.

### 2.      The 2003 Ford F-150.

The Debtors did not disclose the transfer of this vehicle on their statement of financial

affairs.  And, much like the circumstances surrounding the transfer of the RAV4, the Crabtrees

tried to "explain why" such failure should be excused.  However, such explanations ring hollow

with any degree of credibility.

The 2003 Ford F-150 was purchased with the insurance proceeds the Debtors received in

May 2007 from the 1999 Ford pickup that was totaled.  Title to the 2003 Ford was placed jointly

in Terryl's name and in Bror's name.  On November 4, 2013, Terryl transferred her interest in

the vehicle to Bror.  She did not receive any compensation for the transfer.

At the meeting of creditors held on February 3, 2014, Todd testified that the 2003 Ford

had been totaled, and that the proceeds from **that** vehicle were used to purchase a different

vehicle – a 2007 Ford F-150 – a statement that was not true.  It wasn't until the next continued

meeting of creditors, on March 3, 2014, that the Debtors disclosed that it was the 1999 vehicle

that was totaled, and that both Terryl and Bror were joint owners of the 2003 Ford F-150.

Like the RAV4, the Court finds that the failure to disclose the transfer of the 2003 Ford

F-150 on the statement of financial affairs was a false oath, made with fraudulent intent, and that

it was material.

### 3.      The 2007 GMC Yukon.

This vehicle was purchased by Crabtree Law Firm; it also paid for regular maintenance

and general upkeep of it.  Initially, the GMC Yukon was driven by Todd and Terryl, although

later it was driven by Mike and Bethany.  All of these individuals used it for personal purposes.

The law firm transferred title to the vehicle to Mike Harris in 2013.  Even though title was listed

in the name of Crabtree Law Firm, for the same reasons set forth in Section I, A, 5, *supra*, the

Court views the GMC Yukon as belonging to the Crabtrees.  Transfer of title was not disclosed

in the Debtors' statement of financial affairs; neither was it disclosed at the meeting of creditors

held on February 3, 2014.  The transfer was not disclosed until the continued meeting of

creditors held on May 22, 2014.  See Ex. 62, at 26.

The Crabtrees attempted to justify the transfer to Mr. Harris, claiming that it was given to

him in exchange for his work for Crabtree Law Firm, but when asked if the law firm kept track

of Mike Harris's time, Todd said that no records were kept.  Todd also claimed that an IRS Form

1099 was issued to Mike Harris; yet, at the time of trial, he had not yet received it.  Further, Mr.

Harris testified that he never expected payment for his work at Crabtree Law Firm, and that he

was already driving the GMC Yukon prior to the transfer.

Again, like the RAV4, and the 2003 Ford F-150, the Court finds that several false oaths

were made in connection with the transfer of the 2007 Yukon: all were false when made; they

were made with fraudulent intent; and they were material.

### 4.        Transfer of Silver Coins to Mike Harris.

Prior to the filing, the Crabtrees transferred 250 silver coins to Mike Harris.  In

September 2013 he cashed in the coins at a North Dakota coin dealer and realized $6,353.00 for

the sale.  The Crabtrees testified that the funds went to pay construction bills connected with the

building of the homestead; however, only $2,353.47 could be traced directly to invoices related

to the home improvements.  The balance of the funds, $4,021.53, were deposited directly into

Mike and Bethany's joint account, for their personal use.

At the meeting of creditors held on March 3, 2014, the Crabtrees testified that the coins

were given to Mike Harris to pay him for work done on the house, even though he was not owed

any money.  Significantly, Mike and Bethany, together with their three children, also live at the

homestead.

In sum, the Crabtrees testified falsely about the entirety of the circumstances surrounding

the transfer of the 250 silver coins to Mike Harris.  Granted, the actual transfer was disclosed in

the statement of financial affairs; however, the underlying purpose of the transfer was never fully

and truthfully disclosed.  Again, the statements were false, fraudulently made, with the purpose

to deceive, and were material.

**5.        Failure to Disclose the Transfers of Money to Bethany**.

The Crabtrees failed to disclose the transfer of over $56,000.00 to their daughter,

Bethany, from August 4, 2012 through December 16, 2013, the date they filed their bankruptcy

petition.  Most of these transfers went into the "farm account."  Despite several opportunities for

Todd and Terryl to disclose and/or explain these transfers, they did not.  Further, their

explanation as to why they did not disclose them rings hollow.  Indeed, they had several chances

to disclose the transfers – at three continued meetings of creditors: February 3, 2014; March 3,

2014; and May 22, 2014.  Their silence was "deafening."

As the UST points out in his post-trial brief: "Now, the Crabtrees seek to have it both

ways: they testified that they had no control over the funds when they were transferred, 4-29-15

transcript, at 9:13-16, but claim that they did not need to disclose the transfer of funds because

Bethany was 'simply making payments for our home' with the funds."  Id. at 105:16-106:10.

In short, the transfers should have been disclosed.  They were not.  Such failure

constitutes a false oath, it was fraudulent when made, and it was material.  The Crabtrees'

discharge is denied on this false oath.

**6.        False Oath – Ownership Interest in Crabtree Brothers.**

On Schedule B of the schedules, the Debtors listed Todd's 50% ownership interest in

Crabtree Brothers as "0.00 – debts exceed assets."  In point of fact, Todd had still claimed at

least a 75% ownership interest, as reflected on this tax returns.  Todd testified that the entity was

defunct as early as 2013, although at the time of the petition, December 16, 2013, the entity still

owned four lots, each valued at $30,000.00.  At trial, Todd testified that one of the lots was being

transferred to a contractor in settlement of a lawsuit.  That would leave three lots, at $30,000.00

apiece, and Todd's 50% in those remaining lots, or $45,000.00 of value for the estate.

Because Todd did not list the true value of his interest in Crabtree Brothers, his testimony

was false, made with fraudulent intent, and was material.  This is also a false oath for which

Todd's discharge should be denied.

### 7.  The John Deere 4400 Tractor.

On their statement of financial affairs, the Crabtrees listed that they held for Gunnar, at

their homestead, a John Deere 4400 tractor with attachments.  This disclosure markedly deviates

from the Debtors' pattern of failing to disclose information.  Yet the UST argues that because the

Debtors own the John Deere 4400 tractor, they provided false oaths about their ownership

interest to an extent worthy of a denial of discharge.  The Court disagrees with the UST, because

the record lacks enough proof to show that the Debtors' statement was done with a fraudulent

intent.

The record was not developed enough to show that the Debtors supplied their statement

about the John Deere 4400 tractor with a fraudulent intent.  Todd testified that he promised the

John Deere 4400 tractor to Gunnar sometime in 2009 or 2010.  Even though no documentation

showing the transfer of ownership to Gunnar was furnished, Todd testified that he gave the

tractor to Gunnar in 2010 to plant a corn field.  Gunnar, strikingly though, started farming in

either 2013 or 2014, according to his testimony.  And the John Deere 4400  tractor was

extensively used by the Debtors, and repairs on it were paid by the farm account.  These

circumstances, however, speak more to the Debtors' relation to the John Deere 4400 tractor than

to any fraudulent intent in making a statement.  Notably, unlike the other grounds for denial of

the Debtors' discharge, the Debtors listed the John Deere 4400 tractor, albeit in their statement

of financial affairs.  In sum, based on the record, the Court cannot find that the Debtors supplied

a fraudulent intent in making this statement.

Therefore, the Court finds that the Debtors' disclosure of the John Deere 4400 tractor on

the statement of financial affairs was not a false oath.  Accordingly, this is not a ground for a

denial of the Debtors' discharge.

## II.

## OBJECTIONS TO CLAIMED EXEMPTIONS

The Debtors have claimed their 80-acre homestead located at 28000 415th St., Vergas,

MN, exempt under MINN. STAT. § 510.02, with an estimated market value of $200,000.00, and

$66,275.00 of equity in it.  They also claim $1,500.00 in farm equipment as exempt as "tools of

the trade" under  MINN. STAT. § 550.37, Subd. 6.  The Debtors also claimed an exemption in

certain farm animals as "foodstuffs" under MINN. STAT. § 550.37, Subd. 5.  The Trustee objected

to the foregoing exemptions (ECF Nos. 48 and 60); the evidentiary hearing on the Trustee's

objections was held on June 25th and July 29, 2015.

### A.      Exemptions, Generally

In undertaking an exemption analysis, courts are generally guided by the principle that

statutes are to be liberally construed:

> [It is] the general rule that courts should construe exemption statutes liberally in
> favor of the debtor.  Norwest Bank Nebraska, N.A. v. Tveten, 843 F.2d 871, 875
> (8th Cir. 1988) ("the policy of [exemption] statutes is to favor the debtors at the
> expense of the creditors ... such statutes are construed liberally in favor of the
> exemption'") (citing Forsberg v. Security State Bank, 15 F.2d 499, 501 (8th Cir.
> 1926)); Murray v. Zuke, 408 F.2d 483, 487 (8th Cir. 1969) ("exemption laws
> were manifestly enacted for the relief of a debtor . . . and should be liberally

construed.”).

In re Wallerstedt, 930 F.2d 630, 631-32 (8th Cir. 1991).

### B.      Homestead Exemption – 11 U.S.C. § 522(o)

An exception to the liberal construction of exemptions is contained in § 522(o) of the

Bankruptcy Code, which provides:

> (o) For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in–
>
> (1) real or personal property that the debtor or a dependent of the debtor uses as a residence;
> (2) a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence;
> (3) a burial plot for the debtor or a dependent of the debtor; or
> (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead; shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o).

> In other words, the amount of a state homestead exemption is reduced to the extent that the value of the exemption is attributable to nonexempt property that the debtor converted into the homestead within 10 years of filing for bankruptcy, if the conversion was made with the intent to hinder, delay, or defraud creditors.

In re Enloe, 542 B.R. 414, 422 (Bankr. S.D. Tex. 2015) (citing Addison v. Seaver (In re

Addison), 540 F.3d 805, 810 (8th Cir. 2008)).

Section 522(o) was added by the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005 (“BAPCPA”), Pub.L. 109-8, Title III § 308, Apr. 20, 2005, 119 Stat. 23.

> The purpose of the § 522 amendments was to prevent debtors from gaming the system by bulking up on homestead exemptions at the expense of their creditors. The legislative history of BAPCPA’s § 522 amendments makes this clear.  As to

§ 522(o) the legislative history states: "To the extent a debtor's homestead
exemption was obtained through the fraudulent conversion of nonexempt assets
(e.g., cash) during the ten-year period preceding the filing of the bankruptcy case,
S. 256 requires such exemption to be reduced by the amount attributable to the
debtor's fraud."

In re Smither, 542 B.R. 39, 48 (Bankr. D. Mass. 2015) (quoting Soule v. Willcut (In re Willcut),

472 B.R. 88, 94-95 (B.A.P. 10th Cir. 2012) (citing H.R. Rep. No. 109-31 pt. 1, at 16 (2005),

reprinted in 2005 U.S.C.C.A.N. 88, 102) (footnotes omitted)).  "Ultimately, it appears that the

purpose of adding § 522(o) and § 522(p) in 2005 was the attempt by Congress to address the

pre-BAPCPA 'mansion loophole' and to limit the value of homestead exemptions when there is

fraud."  In re Willcut, 472 B.R. 88, 94 (B.A.P. 10th Cir. 2012).

Under § 522(o), the amount of an exemption of a state homestead "is reduced to the

extent that the value of the exemption is attributable to nonexempt property that the debtor

converted into the homestead, if the conversion was made 'with the intent to hinder, delay or

defraud a creditor.'"  In re Addison, 540 F.3d 805, 809 (8th Cir. 2008).  Stated another way, the

Debtors' homestead exemption can be reduced to the extent that it was increased with the intent

to hinder, delay, or defraud creditors.  11 U.S.C. § 522(o).  Specifically:

To succeed in an attempt to limit a homestead exemption under § 522(o)(4), the Trustee
must show (1) that the debtor disposed of property within the 10 years preceding the
filing of the bankruptcy petition, (2) that the proceeds from such disposition were used to
increase the value of the debtor's homestead, (3) that the property disposed of was not
itself exempt, and (4) that in doing so, the Debtor acted with the intent to hinder, delay or
defraud a creditor.

As a preliminary matter, this Court agrees with those courts who have held that an
actual intent to defraud, similar to what is required under § 727(a)(2)(A), must be
shown before § 522(o) will apply.  While § 727(a)(2)(A) allows a Court to deny a
debtor's discharge for fraudulent conduct, § 522(o) goes one step further by
providing the trustee the ability to recoup the property that was fraudulently
transferred for the benefit of the estate, similar to the powers the trustee has to

53

avoid preferential or fraudulent transfers under §§ 547 or 548.

U.S. Trustee v. Keck (In re Keck), 363 B.R. 193, 208 (Bankr. D. Kan. 2007) (footnotes omitted).

See also Wolters v. Lakey, 456 B.R. 687, 700 (D. Kan. 2011) ("To prevail on an objection to the

homestead exemption under 11 U.S.C. § 522(o), the moving party must demonstrate: (1) that the

debtor disposed of property within the 10 years preceding the filing of the bankruptcy petition,

(2) that the proceeds from such disposition were used to increase the value of the debtor's

homestead, (3) that the property disposed of was not itself exempt, and (4) that in doing so, the

debtor acted with intent to hinder, delay or defraud a creditor.").

> Section 522(o) relates to "property that the debtor disposed of in the 10–year
> period ending on the date of the filing of the petition with the intent to hinder,
> delay, or defraud a creditor . . . ."  The operative date is not [debtor]'s state of
> mind as of the petition date, but rather his state of mind when he made the
> transfers.

In re Enloe, 542 B.R. 414, 428 (Bankr. S.D. Tex. 2015) (citing Cipolla v. Roberts (In re Cipolla),

476 Fed. App'x 301, 306 (5th Cir. 2012)).

Because direct evidence of fraudulent intent is generally not available, the court may

infer such intent from badges of fraud and the circumstances surrounding the transfer.  Id. at

811-12; see also In re Maronde, 332 B.R. 593, 600 (Bankr. D. Minn. 2005) (citing Brown v.

Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1353 (8th Cir. 1995)).  It is appropriate to look

to the badges of fraud in determining the debtor's intent to hinder, delay, or defraud a creditor

under § 522(o).  The presence of several or more badges of fraud establishes a presumption of

fraudulent intent. In re Northgate Computer Systems, Inc., 240 B.R. 328, 360-61 (Bankr. D.

Minn. 1999) (citing Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998)).

As recently stated by the Eighth Circuit:

"[O]ur cases have used the inferential 'badges of fraud' approach to determine whether a debtor acted with 'intent to hinder, delay, or defraud [ ]' a creditor regardless of whether the intent language came from a state fraudulent transfer statute or applicable bankruptcy law." In re Addison, 540 F.3d 805, 811–12 (8th Cir. 2008) (applying Minnesota's statutory badges of fraud to both state and federal fraudulent transfer claims). The UFTA, as enacted at Minn. Stat. § 513.44(b), "contains a lengthy list of factors or 'badges of fraud' which a court may look to for help in determining actual intent." In re Sholdan, 217 F.3d 1006, 1008 (8th Cir. 2000). "Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent. In such cases, 'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue,' " Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998) (internal citations omitted) (quoting In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994)), namely that the transferee accepted the transfer in good faith and for value, see 11 U.S.C. § 548(c).

Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 861-62 (8th Cir. 2015).

Minn. Stat. § 513.44(b) provides:

(b) In determining actual intent [to hinder, delay, or defraud any creditor of the debtor], consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b). The courts have also identified additional badges of fraud, including "further conduct intentionally designed to materially mislead or deceive creditors about the debtor's position[.]" In re Johnson, 880 F.2d 78, 82 (8th Cir. 1989).

No magic number of badges need to be present to show fraudulent intent. Instead, the presence of multiple badges may be indicative of actual intent. See In re Sherman, 67 F.3d 1348,

1354 (8th Cir. 1995) ("The confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose. (Internal citations omitted))."  The Court is not limited to these enumerated badges, and, in fact, it should consider any other factors or evidence that may have a bearing on the issue of fraudulent intent.  See In re Sholdan, 217 F.3d 1006, 1010 (8th Cir. 2000).  At the end of the day, the focus of the inquiry "is whether [the debtor] is attempting to thwart his creditors rather than making an honest attempt to repay them."  Maronde, 332 B.R. at 600 (citing In re Mattson, 241 B.R. 629, 637 (Bankr. D. Minn. 1999)).

While it was not alleged that the Debtors received any compensation for the fraudulent transfers alleged by the Trustee, which was applied to the value of the homestead, the number of fraudulent transfers could be viewed as part of the Debtors' "entire pattern of conduct" regarding the fraudulent conveyancing of their assets.  In re Addison, 540 F.3d at 817.  On such a score, a relevant badge of fraud is a debtor's conversion of nearly all of the debtor's exempt assets.  See Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 876 (8th Cir. 1988).  See also In re Addison, 540 F.3d at 817.  Tveten involved a jurisdiction that allowed an unlimited homestead exemption.  The debtor converted nearly his entire net worth of $700,000.00 into exempt property leaving virtually nothing to satisfy nearly $19,000,000.00 in debt.  Tveten, 848 F.2d at 876.  The Court found that this was indicative of Tveten's intent to hinder, delay or defraud his creditors.  Conversely, in Addison, the Court found that no fraudulent intent where a debtor "left substantial nonexempt assets for his creditors to recover."  In re Addison, 540 F.3d at 817.

As recently summarized by Judge Sanberg:

Under Minnesota's enactment of the Uniform Fraudulent Transfer Act, Minn.

Stat. § 513.44, a debtor may not claim an exemption in property obtained through a transfer made by the debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor." Additionally, under 11 U.S.C. § 522(o), the amount of an exemption of a state homestead "is reduced to the extent that the value of the exemption is attributable to nonexempt property that the debtor converted into the homestead, if the conversion was made 'with the intent to hinder, delay or defraud a creditor.'" In re Addison, 540 F.3d 805, 809 (8th Cir. 2008). Because direct evidence of fraudulent intent is generally not available, the court may infer such intent from badges of fraud and the circumstances surrounding the transfer.

In re Vu, No. BR 12-46862, 2013 WL 5442275, at *3 (Bankr. D. Minn. Sept. 30, 2013).

The badges of fraud are also looked at in determining intent to hinder, delay, or defraud a creditor under 11 U.S.C. § 522(o). The presence of several or more badges of fraud establishes a presumption of fraudulent intent. In re Northgate Computer Systems, Inc., 240 B.R. 328, 360–61 (Bankr. D. Minn. 1999) (citing Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998)). In the final analysis, the simple question "is whether [the debtor] is attempting to thwart his creditors rather than making an honest attempt to repay them." Maronde, 332 B.R. at 600 (citing In re Mattson, 241 B.R. 629, 637 (Bankr. D. Minn. 1999)).

Id. at *4.

Because of the importance of the homestead exemption, the Eighth Circuit requires evidence of fraud that is extrinsic to the conversion of non-exempt assets into exempt assets, in addition to the badges of fraud, in order to disallow the homestead exemption. Addison, 540 F.3d at 812–13. In determining extrinsic evidence of intent, courts consider the extent of the conversion of the debtor's assets and the disclosure made by the debtor in the petition, schedules, and statements of financial affairs. Sholdan v. Dietz (In re Sholdan), 217 F.3d 1006, 1010 (8th Cir. 2000).

Id. at *6.

All of the above being well and good, at the close of the Trustee's case-in-chief, an oral motion was made on behalf of the Debtors to "dismiss" the homestead objection on the basis that the Trustee failed to offer any evidence as to the extent the value of the Debtors' homestead was increased by funds invested in it by the Debtors. The Court reserved ruling on this motion. Based on the following discussion, the Court hereby denies the motion. Courts have interpreted

the element asserted by the Debtors to be at issue, in conflicting ways.

In In re Keck, the court stated that under § 522(o)(4), the Trustee must show, *inter alia*, "that the proceeds from such disposition were used to increase the value of the debtor's homestead[.]" U.S. Trustee v. Keck (In re Keck), 363 B.R. 193, 208 (Bankr. D. Kan. 2007). The court found that Keck made cash withdrawals to pay for the following improvements: (1) $5,878.61 for the installation of a driveway; (2) $5,680.00 for the installation of a patio; and (3) $4,414.18 to pay down a lien against the property. Id. at 209-10. The court also found that the debtor made a significant number of cash advances from his credit cards along with payments toward the lien on the homestead, but the court was unable to trace the payments to the cash advances. Id. at 210. As such, the court reduced the debtor's homestead exemption by $15,972.79, representing the cost of the improvements and the lien pay-down that was traceable to the non-exempt transfers:

> Because the Court cannot determine . . . the exact amount Debtor increased the value of his homestead from his credit card cash advances, the Court finds the Trustee's objection must be overruled to [the] extent it seeks to reduce the value of the Debtor's homestead beyond $15,972.79.

Id. at 211. And see Vu, 2013 WL 5442275 (no discussion of issue raised by the Debtors in the case at bar, but nonetheless sustained the trustee's objection under § 522(o) to the debtor's homestead exemption).

A similar analysis was employed by the court in In re Roberts, where the court held that the debtors acted with intent to hinder, delay, or defraud creditors, within the meaning of § 522(o), thereby warranting a reduction of the homestead exemption claimed by the debtors. In re Roberts, 527 B.R. 461 (Bankr. N.D. Fla. 2015) (Chapter 7 debtors acted with intent to hinder,

delay or defraud creditors, warranting reduction of homestead exemption claimed by debtors,

when debtors liquidated substantial non-exempt assets to fund the construction of new home,

they did not disclose those transfers or value of and equity in new home to mortgagee of former

home when they continued with short sale of former home and received forgiveness of about

$250,000.00 in debt, debtors misled mortgagee by failing to disclose that their inability to pay

mortgage for former home was caused entirely by liquidation of their assets for construction of

new home and that they defaulted on mortgage for former home while in the process of

transferring assets and building new home, and as a result of debtors transfers, their balance

sheet went from several hundred thousand dollars' worth of non-exempt assets to $0.00).

The debtors in <u>Roberts</u> purchased a lot sometime in 2004 or 2005.  <u>Id.</u> at 464.  The lot

was purchased for $240,000.00.  <u>Id.</u>  The debtors claimed that they purchased the lot with the

intention of building their dream house on the property.  <u>Id.</u>  Shortly thereafter, the debtors

changed their mind and decided not to build a new house.  <u>Id.</u> at 464-65.

By 2009, the debtors were in severe financial trouble due to a downturn in the housing

market.  Beginning in February, the debtors either took out or renewed large loans while

liquidating assets.  The court noted that the debtors sold a vacant lot for $80,000.00, a second

vacant lot for $30,000.00, a boat for $50,000.00, and a third vacant lot for $25,000.00.  <u>Id.</u> at 462

n.6.  In addition, the debtors used at least $209,875.28 from their money market account.  <u>Id.</u>  In

March, the debtors also recommenced construction on the vacant lot purchased in 2004 or 2005.

They moved into the new home in October.  By December, the debtors had spent $385,595.24 on

the construction of the new home.  The debtors then defaulted on the mortgage payments for

their first home and let it fall into foreclosure.  They fraudulently applied for a short sale without

59

informing the bank that they had constructed and moved into a new home and in April of 2010,

the bank forgave the remainder of the debt secured by their existing home.

The court in <u>Roberts</u> found that the debtors acted with intent to hinder delay or defraud

creditors under § 522(o).  The court looked to the value of the debtors' liquidated assets, and

noted that they totaled $394,875.28.  The court allowed the trustee to reduce the debtors'

homestead exemption for the entire $394,875.28.  This was in excess of the $385,595.24 that the

court found the debtors had spent in building the property and was far in excess of the

$328,588.50 in equity that the debtors were claiming as their homestead exemption.

The court in <u>In re Presto</u>, however, wrote:  "Improvements, unlike payments of principal,

do not result in a dollar-for-dollar increase in the value of property."  <u>In re Presto</u>, 376 B.R. 554,

572 n.19 (Bankr. S.D. Tex. 2007).  The Crabtrees argue that the Trustee should be required to

show how much of their homestead equity is directly attributable to the transfer of non-exempt

assets, like the Court in <u>Presto</u> required:

> Simply because the [objecting party] has established [the debtor's fraudulent
> intent] does not mean that the relief to which it is entitled should be the full
> amount spent on the improvements to the [property]. The scope of the statute is
> limited to the value in a debtor's homestead that is "attributable" to nonexempt
> property that was fraudulently converted into equity in the homestead. The
> [objecting party] bears the burden of establishing a current market value in
> excess, of the . . . purchase price in order to show by what amount the
> improvements made by the Debtor actually increased the value of the . . .
> property.

<u>Id.</u> at 572.  And in a footnote to the above-quoted text, the court in <u>Presto</u> went on to note:

> The [objecting party] argues that it is entitled to recover the entire value of any
> nonexempt property that was disposed of through improvements to the [property].
> In support of this position, the [objecting party] relies on <u>In re Keck</u>, 363 B.R.
> 193 (Bankr. D. Ka[n]. 2007). . . . While <u>Keck</u> supports the [objecting party's]
> interpretation, the Court does not find it persuasive because the court in <u>Keck</u> did

60

not account for the statute's use of the word "attributable."

> The [objecting party's] reading is correct in circumstances, such as in [In re]
> Sissom, [366 B.R. 677 (Bankr. S.D. Tex. 2007)], where nonexempt assets were
> used as a down payment or to pay down principal because these uses have a
> direct, equivalent increase in equity.  However, in the case at bar, the Debtor used
> nonexempt assets only on improvements to the [property]. Improvements, unlike
> payments of principal, do not result in a dollar-for-dollar increase in the value of a
> property. In cases where property has increased in value over longer periods of
> time, the objecting party would also have to show that the increase did not occur
> from market appreciation.

Id. at 572 n.19.  See also In re Smith, No. 4:13-CV-1313, 2016 WL 1266522, at *4, *6 (S.D.

Tex. Mar. 31, 2016) (citing Presto, but ultimately concluding that there was insufficient direct

and indirect evidence of fraud, and that §522(o) did not apply); In re Smither, 542 B.R. 39, 48-49

(Bankr. D. Mass. 2015) ("In In re Corbett, 478 B.R. 62, 69 (Bankr. D. Mass. 2012), Judge Joan

N. Feeney of this court articulated a four-part test for determining whether § 522(o) should be

applied to reduce a debtor's claimed homestead exemption.  The party seeking to invoke §

522(o) must establish that: '(1) the debtor disposed of property within the 10 years preceding the

bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the

proceeds from the sale of the nonexempt property were used to buy a new homestead, improve

an existing homestead, or reduce the debt associated with an existing homestead; and (4) the

debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor.'

Id. (quoting In re Presto, 376 B.R. 554, 568 (Bankr. S.D. Tex. 2007)).").

The Court agrees with the analyses employed by the Roberts and Keck courts, and

concludes that the Presto court unnecessarily complicates the § 522(o) inquiry.  For the reasons

set forth below, the Crabtrees' homestead exemption will be reduced by the sum of $74,294.68.

As mentioned above, § 522(o) contemplates a "look-back" period of 10 years from the

date of filing.  The Debtors filed their voluntary petition on December 16, 2013; thus, one can

"look back" to December 16, 2003.  Going back that far is unnecessary in this case, since most

of the suspect transfers were made in the time period going back to 2012.

Exhibit EEEE clearly sets forth the disposition of transfers made into the farm account:

- $8,000.00 check from Terryl to Bethany (August 6, 2012);

- $7,000.00 check from Terryl to Bethany (September 4, 2012);

- $30,000.00 check from Todd to Bethany (October 25, 2012); and

- Several transfers from both of the Debtors totaling $11,779.00 (December 3, 2012 to September 17, 2013).

There were other transfers made directly to the contractors/suppliers on the homestead

made by or on behalf of the Crabtrees, to wit:  $19,990.00 wire transfer from Dianne Merrifield

to Pierce Log Homes; $6,000.00 from Todd to Ugstad Plumbing; and $2,353.47 left over from

the silver coins given to Mike Harris that were used to pay three outstanding bills.

In addition, there were transfers from the farm account to contractors/supplies totaling

$45,951.21, made between August 21, 2012 to December 3, 2012.  Notably, the transfers made

by the Debtors **into** the farm account correspond quite closely with the dates on which the

checks were written **from** the farm account.

The Trustee must also prove that none of the assets disposed of were or could be claimed

as exempt.  Each of the specific transfers from the farm account was either cash, cash equivalent,

or silver coins.  None of this personal property could be claimed as exempt under MINN. STAT.

§ 550.37.  Also, the majority of the transfers constituted Todd's inheritance from the Ralph

Blohm estate, or by the gift from his sister, Dianne Merrifield.  None of these transfers could be

claimed as exempt.  In short, the Trustee has satisfied his burden in establishing this element of §

522(o).

That leaves the final element: that the Debtors acted with the intent to hinder, delay, or

defraud a creditor.  The Trustee also has proven this element.

The badges of fraud in this case:

1.   Both Todd and the entity in which he was the sole owner, Crabtree Law Firm, had
     judgments against them for $390,094.23 and $391,253.48, respectively.  Todd
     entered into a settlement agreement with CAG in January 2011, in which he
     agreed to pay CAG the monthly sum of $3,860.09 to satisfy the settlement
     amount of $400,000.00.  Beginning in April 2013, the transfers of significant
     sums of money began funneling into improvements to the homestead.  This was
     also about the time of the foreclosure upon the Debtors' home in Scandia, MN.

2.   CAG attempted to levy upon Crabtree Law Firms bank accounts.  In response,
     Todd terminated the law firm, and on December 5, 2013, he formed Crabtree
     Health Law.  All accounts receivable of Crabtree Law Firm were then transferred
     to Crabtree Health Law.  All of these actions were taken in an effort at thwarting
     CAG's efforts at collecting on the judgments.

3.   Todd not only was a beneficiary of the estate of his step-father, Ralph Blohm, Jr.,
     he also was the executor.  He took his share of the proceeds from the sale of the
     lake cabin and deposited them into his personal account at the Woodlands
     National Bank, which he also used to administer the funds of the estate.  He then
     wrote two checks from that account – one to his wife, Terryl, for $19,333.85, and
     one to his daughter, Bethany, for $30,000.00, which was purportedly "earmarked"
     for the farm account.  These transfers occurred in October 2012, well after CAG
     had obtained the judgments.

4.   The "gifts" from Dianne Merrifield, Todd's sister, to Terryl of $20,000.00, and to
     Pierce Log Homes of $19,990.00, were both used to increase the Debtors' equity
     in their homestead, rather than be used to pay back their creditors.  Neither of
     these "gifts" was disclosed on the Debtors' schedules or on the statement of
     financial affairs.

5.   The Wells Fargo checking account known as the "farm account" was set up by
     Todd and Terryl to handle all the funds used in the building and improvements
     made to the homestead.  It was set up in the names of their children, Bethany and
     Bror.  Although they were the "named owners"of the account, the evidence

showed that Todd directed the flow of the funds to pay the various contractors and suppliers.  In fact, he negotiated directly with many of the contractors for the price and other details regarding the construction project. In short, he controlled the funds in that account.

6.   The transfers of money in the summer of 2012 and the silver coins in August 2013, were made to family members, all insiders.

7.   The other transfers made by the Debtors are also highly suspect; they add to the overall "pattern of conduct" contemplated by the <u>Addison</u> case:

- •   500 silver coins to Firestarters;
- •   $3,649.00 worth of audio equipment to Firestarters;
- •   $10,000.00 to Schmit Moving Co. to move the "St. Paul Building";
- •   500 silver coins to Bror;
- •   400 silver coins to Gunnar;
- •   2004 Toyota RAV4 to Gunnar;
- •   2007 GMC Yukon and silver coins to Mike Harris; and
- •   2003 Ford F-150 to Bror.

8.   As can be readily seen from a review of the Debtors' Amended Schedule C, the Debtors left very few non-exempt assets for distribution to their creditors.  The minimal amount of these non-exempt assets pales in comparison to the significant transfers made by the Debtors to insiders and to increase the equity in their homestead.

In summary, the Trustee has met his burden of proof in establishing all the requisite elements of § 522(o); the Debtors' homestead exemption is hereby reduced by $74,294.68.

## C.   Foodstuffs and Tools of the Trade Exemptions

The Debtors filed an Amended Schedule C wherein they claimed as exempt a one-third interest in rabbits, goats and chickens "being used to produce or be food" as "foodstuffs of the debtor and the debtor's family" under Minn. Stat. § 550.37, Subd. 4(a).  They also withdrew their claimed exemption in jewelry valued at $815.00 and farm supplies valued at $250.00.  The Debtors amended the basis for claiming various items of farm equipment[25] from Minn. Stat.

---

[25]   White trailer, pressure washer, generator, chain saw, DeWalt skill saw, DeWalt drill, DeWalt SawzAll, and angle driver, all valued at $1,500.00.

§ 550.37, Subd. 5, "farm machines and implements used in farming operations by a debtor

engaged principally in farming," to MINN. STAT. § 550.37, Subd. 6, as "tools, implements,

machines, instruments . . . necessary in the trade, business, or profession of the debtor."

Although the Trustee objected to the Debtors' claim of exemption to the rabbits, goats

and chickens, he did not pursue his objection at the trial of the matter, nor did he address the

issue in his post-trial brief.  Accordingly, he has abandoned the objection, and the exemption to

the animals as "foodstuffs" will be upheld.  In re Gurvich, 132 B.R. 976, 978 (Bankr. S.D. Fla.

1990) ("[T]he objecting parties did not argue or present evidence on [their objection to the

claimed objection] and, therefore, are deemed to have abandoned that argument."). The Trustee's

objection to the Debtors' "foodstuffs objection" is **OVERRULED**.

The Crabtrees attempt to claim the various items of equipment as "tools of the trade" is a

stretch.  Even though both Debtors testified to their desire to start a "self-sustaining farm

community," neither Todd nor Terryl could even remotely be considered  a "farmer."  Todd was

educated as an attorney and chiropractor.  He is still actively engaged as an attorney in his

business, Crabtree Health Law, and as an entrepreneur in Clinic Doctor.  Terryl describes her

occupation as "being in marketing," as an employee of Clinic Doctor.  The testimony was

undisputed that ever since moving out to the homestead near Vergas, Minnesota, that they had

never made any money from their "farm."

A corollary analysis with respect to MINN. STAT. § 550.37, Subd. 5, which provides an

exemption for farm machines, is instructive:

> "Whether a debtor qualifies for the exemption provided by Minn. Stat. 550.37,
> Subd. 5, depends on the debtor's historical involvement with farming and present
> intentions."  See In re Zimmel, 185 B.R. 786, 789 (Bankr. D. Minn. 1995). "The

analysis should take into account the intensity of a debtor's past farming activities
and the sincerity of his intentions to continue farming, as well as evidence that the
debtor is legitimately engaged in a trade which currently and regularly uses the
specific implements or tools exempted." Id., citing Middleton v. Farmers State
Bank of Fosston, 41 B.R. 953, 955 (D. Minn. 1984); In re Yoder, 32 B.R. 777
(Bankr. W.D. Pa. 1983); Production Credit Association v. LaFond, 61 B.R. 303,
306 (D. Minn. 1985).

"It has long been recognized in this district that farming operations of the type
involved here are family occupations." Zimmel, 185 B.R. at 790, citing In re
Pommerer, 10 B.R. 935, 942 (Bankr. D. Minn. 1981) (One would have to "blind
oneself to reality not to recognize that a small farm in Minnesota is a family
occupation." Debtor's wife, therefore, must also be considered a farmer.) "The
nature of the enterprise as a family occupation has been recognized, even where
one spouse has maintained full-time employment off-farm during the period under
consideration." Zimmel, 185 B.R. at 790, citing In re Peters, 60 B.R. 711 (Bankr.
D. Minn.1986).

In re Miller, 370 B.R. 914, 917-18 (Bankr. D. Minn. 2007) (debtor-wife was farmer engaged

principally in farming for purposes of Minnesota exemption for farm machines). But see In re

Hintzman, No. 05–61378, 2007 WL 80964 (Bankr. D. Minn. 2007) (the debtors "owned no real

estate, rented no crop or pasture land, had no livestock, no crops, and no farming inventory;" the

debtors had "not been able to take any significant steps to become 'engaged principally in

farming' since the filing of the case;" they were "unable to even predict when, if ever, they might

be in a position to become 'engaged principally in farming.'").

To be able to legitimately claim the exemption to their equipment, as "tools of the

trade," "the debtor[s] must be engaged in farming at the time the exemption is claimed

or have a present interest to continue farming at some point in the future." In re Fossum, 59 B.R.

820, 823 (Bankr. D. Minn. 1986) (citing In re Middleton, 45 B.R. 744 (Bankr. D. Minn. 1985)).

Trying to "scratch the existence out of the woods," or raising a few rabbits, goats, chickens, and

pigs simply does not equate to being a "farmer."

Indeed, the Bankruptcy Code defines a "farmer" as being a "person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person." 11 U.S.C. § 101(20). A review of the Crabtrees' federal tax return for 2012 shows no Schedule F[26] attached to it. Their adjusted gross income for that year was derived from wages and real estate rentals. See Ex. 38.

Neither do the Crabtrees fit the description of a "family farmer" under § 101(18)(A). The income derived from their "farming operation" did not exceed 50 percent of their gross income for either 2012 (the tax year preceding the year their case was filed) or 2011 and 2010 (the 2d and 3d taxable years, respectively, preceding the year their case was filed). See Ex. 37 and Ex. 36, respectively.

The Court recognizes that a rigid reliance upon the Code's definition of a "farmer" is not dispositive of the exemption issue presented here. After all, the provisions cited above go to one's eligibility to file a case under chapter 12, in the first instance. The statutory definitions of a "farmer" and a "family farmer" do, however, provide context. It is simply implausible to consider the Crabtrees as "farmers" to be able to legitimately exempt the farm equipment listed. Therefore, the Trustee's objection to the claim of exemption to that property is **SUSTAINED**.

## IV.

## CLOSING REMARK

One point with respect to the bench trial in these matters warrants emphasis: Especially

---

[26] IRS Form Schedule F (Form 1040), Profit or Loss From Farming.

in the context of a bench trial, the trial judge is charged with judging the credibility of the

witnesses.  As the Eighth Circuit BAP has stated:

> As the trier of fact, it is the burden of the bankruptcy court to assess the
> credibility of the witnesses as well as the sufficiency of the evidence.  See In re
> Interco Inc., 211 B.R. 667, 682 (Bankr. E.D. Mo. 1997).  The bankruptcy court's
> impression of the credibility of the witnesses is entitled to great weight.  See In re
> Barber, 95 B.R. 684, 688 n. 14 (Bankr. W.D. Mo. 1988).  Due regard must be
> given to the opportunity of the bankruptcy judge to assess the credibility of the
> witnesses. See In re Financial Corp., 1 B.R. 522, 525 (W.D. Mo. 1979), aff'd, 634
> F.2d 404 (8th Cir. 1980); Fed. R. Bankr. P. 8013. "'[O]nly the trial judge can be
> aware of the variations in demeanor and tone of voice that bear so heavily on the
> listener's understanding of and belief in what is said.'"  In re McConnehea, 96
> B.R. 121, 124 (S.D. Ohio 1988) (quoting Anderson v. City of Bessemer City, 470
> U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).

In re Fors, 259 B.R. 131, 140 (B.A.P. 8th Cir. 2001).

Indeed, the Eighth Circuit BAP "give[s] due regard to the bankruptcy court's opportunity

to judge the credibility of witnesses." In re Charles, 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012).

See also In re Cecil, 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (affirming bankruptcy court's

finding that debtors' omissions were made with reckless indifference to the truth, and were

therefore intentionally false and fraudulent, for discharge denial purposes; "'Findings of fact,

whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous,

and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility

of the witnesses.'" (quoting In re Bauder, 333 B.R. 828 (B.A.P. 8th Cir. 2005); Parts & Elec.

Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988) ("To be clearly erroneous,

a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as

wrong with the force of a five-week-old, unrefrigerated dead fish.")); and see In re Hernandez,

No. CV 15-3844 (SRN), 2016 WL 3248228, at *16 (D. Minn. June 13, 2016) (noting, *inter alia*,

that the bankruptcy court properly "examined the credibility of the witnesses, describing certain

witnesses as relatively disinterested individuals, . . . and others as persons with vested interests . .

. . Judge Ridgway observed that 'a couple of things about [the debtor's] testimony . . . didn't

quite ring true.'. . .  In this context, Judge Ridgway noted that [the debtor] derived much of the

benefit of the Loan at issue . . . . The Court construes this observation, in this context, to bear on

[the debtor's] credibility, as it concerns his self interest and motivation as a witness.") (internal

citations omitted); In re Freese, 460 B.R. 733, 738-39 (B.A.P. 8th Cir. 2011) (affirming

bankruptcy court's finding that debtor made false statements under oath, as warranted denial of

his discharge, was supported by the record; "The bankruptcy court determined that the Debtor

possessed the requisite knowledge and intent by reviewing the evidence and the circumstances as

a whole, and by judging the Debtor's credibility.  The bankruptcy court's decision was plausible

in light of the record as a whole.  See Anderson, 470 U.S. at 573-74, 105 S. Ct. 1504 (where trial

court's account is plausible, appellate court may not reverse even if it would have weighed the

evidence differently).").

    In this case, the Court was in the best position to assess the credibility of the witnesses,

and in particular, the credibility of both Debtors.  During the course of trial, Todd's credibility

was called into question, leaving his words largely open to doubt.  Moreover, his and Terryl's

attempts at explaining inconsistences produced a greater rift between their words and the words

of their children, the other witnesses, and other admitted evidence.  In light of the record as a

whole, including the Debtors' testimony – especially Todd's – the Court finds the Debtors'

credibility lacking.

**ACCORDINGLY, IT IS ORDERED THAT:**

1.      The Debtors' discharge is **DENIED** under § 727(a)(2)(A), § 727(a)(3), and §

727(a)(4)(A).

2.      The Trustee's objection to the Debtors' homestead exemption is **SUSTAINED**.  Under §

522(o), the Debtors' homestead exemption is reduced by $74,249.68.

3.      The Trustee's objection to the Debtors' claim of exemption under MINN. STAT. § 550.37,

Subd. 4(a) is **OVERRULED**.

4.      The Trustee's objection to the Debtors' claim of exemption under MINN. STAT. § 550.37,

Subd. 6 is **SUSTAINED**.

5.      The Debtors' oral motion to dismiss the Trustee's objection under § 522(o) made at the

close of the Trustee's case-in-chief is **DENIED**.


LET JUDGMENT BE ENTERED ACCORDINGLY.

*/e/ Michael E. Ridgway*
Michael E. Ridgway
United States Bankruptcy Judge